IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ESTATE OF HENRY JOSEPH DARGER,

                Plaintiff,

      v.                                    22 CV 3911

KIYOKO LERNER, individually and as
Executor of the Estate of Nathan Lerner, and as
trustee of any trust established by Nathan
Lerner, and The Nathan and Kiyoko Lerner
Foundation,                               HON. THOMAS M. DURKIN
                                             HON. LAURA K. MCNALLY

                Defendants.

## REVISED MEMORANDUM
### TO
### <u>MOTION FOR SUMMARY JUDGMENT</u>

The defendant Kiyoko Lerner, individually, states the following in support of her Motion For Summary Judgment.

### I.    *Introduction.*

This case involves the art and its intellectual-property rights of Henry Darger, who died in 1973, and the claims of distant relatives, which that were filed 49 years after his death.

The relatives sue to take his art and all money from it from museums, galleries, legitimate purchasers, and Kiyoko Lerner, who is the widow of the person who rented Mr. Darger his room for 40+ years, Nathan Lerner. (Two former-family organizations were not served.).

Mr. Darger was an odd, unkempt man who never met any of his family. Mr. Lerner rented a room to him for 40+ years and reduced his rent in the face of neighbors' complaints that he was an eyesore. Also, Mr. Lerner found Mr. Darger a charity nursing home when Mr. Darger asked, and both Lerners visited Mr. Darger weekly before his death there.

Ms. Lerner states that Mr. Darger gave his art and all his possessions to Mr. Lerner when Mr. Lerner asked Mr. Darger what to do with his possessions in order to rerent the room. Altrnatively, the Estate admits that Mr. Darger threw away his art. Mr. Lerner could have thrown away everything and rerented the room. Instead he recognized the art, and then he, and later Ms. Lerner, arranged for exhibitions of Mr. Darger's art that created the current recognition. Also, Mr. Lerner maintained the room and opened it to people interested in Mr. Darger. Ms. Lerner, later, created a Darger website.

The Estate's claims are barred by the statutes of limitations and laches and by gift and abandonment.

On the statutes of limitations. The Estate bears the burden to prove tolling of the limitations but offers no evidence of what the relatives knew or should have known, and the Estate Administrator testified that she has no idea either. This is enough for summary judgment alone. Additionally, Ms. Lerner has evidence of what the relatives knew or should have known, and the Estate admits Mr. Darger's worldwide fame. This establishes laches.

Furthermore and in an odd twist of the evidence, the heirship report relied on by the Estate to identify relatives specifically states that half of Mr. Darger's relatives could not be found/identified. Neither the Estate nor this court can say what these people know or should have known because no one knows who they are. Additionally, the report is not admissible.

On the merits, summary judgment is required for Mr. Darger's gift because the only evidence of what Mr. Darger said and intended to do with his art comes from two people who heard Mr. Darger say that he gave his art to Mr. Lerner. Separately, the Estate admits that he threw away his art, which establishes abandonment and which, also, gives everything to Mr. Lerner. Other admissions also apply.

2

The Estate has no evidence of Mr. Darger's statements and intent – and never did. Again, this lack of evidence requires summary judgment. Also, the Estate Administrator: (1) admitted that she has no evidence; (2) argued that the burden is on Ms. Lerner to prove the Estate's case; and (3) stated (remarkably) that "if there was evidence of it ["that Mr. Darger did not either give his art to Mr. Lerner or tell Mr. Lerner it can be thrown away"] it would be produced by Ms. Lerner."

The gift or abandonment resolves all claims including the copyright, because federal-and-Illinois law provided for non-written transfers of copyright at the time Mr. Darger was in the nursing home.

Other issues apply, including unsupported intentional-misconduct allegations.

## II.    The Facts.

Mr. Darger was reclusive, odd, lived alone for 40+ years in a room that he rented from Mr. Lerner, Joint Stipulation [hereinafter Stipulation] ¶ 11. No evidence exists that he had any contact with any family members. *Id.* ¶ 46. During these years, he created approximately-300 drawings and wrote a 15,000+-page novel. *Id.* ¶ 9. This art (the drawings and writings) remained in his room underneath piles of papers and other things that he picked out of trash and other papers. *Id.* ¶18; Lerner transcript at 33.

Mr. Lerner discovered Mr. Darger's art when Mr. Lerner went to clean the room to rerent it. Mr. Lerner asked Mr. Darger what he wanted to do with his possessions, and Mr. Darger told Mr. and Mrs. Lerner that he could have all his possessions in the room, that he didn't want them, and that Mr. Lerner could rerent the room. *Id.* 40-41, 145-46; Stipulation ¶ 40. Later, Mr. Darger confirmed to his neighbor in the apartment, David Berglund, that his art belonged to Mr. Lerner. *Id.* ¶39.

3

Mr. Bergland had been asked by Mr. Lerner to help clean out the room.  *Id.*  Mr. Berglund and his wife had invited Mr. Darger for a Christmas dinner earlier, and she briefly cooked breakfast for Mr. Darger when he was incapacitated.  Material Facts [hereinafter Facts] ¶ 16.  Mr. Lerner reduced their rent for this help.  Facts ¶ 17.

Mr. Lerner's concern for Mr. Darger was longstanding.  Mr. Lerner had resisted requests by neighbors not to rent to Mr. Darger, who viewed Mr. Darger as odd and unkempt and had reduced Mr. Darger's rent when Mr. Darger was injured from $40.00 to $30.00 per month.  Stipulation ¶ 43.  Also, Mr. Lerner found Mr. Darger a free nursing home, and the Lerners visited Mr. Darger there about every week until his death.  *Id.* ¶ 40.  Some years later, the Lerners bought a headstone for Mr. Darger's grave.  Lerner transcript at 148-49.

Mr. Lerner did not throw away Mr. Darger's art or rerent his room and appreciated Mr. Darger's art.  *Id.* 46.  Mr. Lerner, and after his death Ms. Lerner, arranged for exhibitions first in Chicago and, later, nationally and internationally.  Stipulation ¶ 19-21, 30, 34, 35, 37 (Darger website, listing all exhibitions); Facts ¶ 15.  Mr. Lerner allowed people interested in Mr. Darger and his art to visit his room.  Stipulation 44.  Mr. Darger's papers were given to a study center for him.  Stipulation ¶ 30.  Ms. Lerner created and maintains a website with the information about Mr. Dadrger's art and its exhibitions.  *Id.* ¶37.

The relatives filed this case in 2022 after being contacted by and meeting with an investigator and his associated copyright lawyer, who were involved in the Vivian Maier case.  Facts ¶ 19.

Other facts and admissions are discussed below.

### III.    Discussion.

#### A.    The Law Of Summary Judgment.

The familiar principles of summary judgment apply: Summary judgment requires the movant to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). All evidence is reviewed, and the Court must draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). Summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. *The Statutes Of Limitations And Laches.*

Summary judgment is required on both the statute of limitations and laches.

#### 1. *Statutes Of Limitations.*

Summary judgment is required on the statutes of limitations because: (1) all claims are filed after the applicable periods, which requires tolling evidence to continue the case and shifts the burden for evidence to the Estate; and (2) the Estate has no evidence to support tolling.

The Estate cannot prove the evidence for tolling for two-independent reasons. First, the Estate lacks evidence of what the relatives knew or should have known, and its Administrator admitted this lack of evidence. Second, fully half of Mr. Darger's heirs are unknown to the Estate and this court because the Estate's heirship report specifically states this.

5

Additionally, the hiership report is not admissible (objection reserved).  Separately and conssequently, the Estate cannot prove heirship.

### a.    The Evidence Requiring Tolling And The Law.

Mr. Darger died in 1973, Stipulation ¶ 3, 49 years before the filing of the Complaint. Exhibit F.

The statute of limitations for each claim is, plainly, less than 49 years.

Under both federal-and-Illinois law, the Estate bears the burden of proving tolling because of the fact that the claims, on their faces, are untimely, *e.g. Drazan v. United States*, 762 F.2d 56, 60 (7th Cir. 1985) (emphasis added):

> Second, although the statute of limitations is of course an affirmative defense, the burden of establishing an exception to the statute of limitations is on the plaintiff. *DeWitt v. United States,* 593 F.2d 276, 281 (7th Cir. 1979); *Wollman v. Gross,* 637 F.2d 544, 549 (8th Cir. 1980).  The government showed that the suit was untimely; it is up to the plaintiff to show that she had no reason to believe that she had been injured by an act or omission by the government.

*Wilkins v. United States*, 598 U.S. 152, 156 (2023):

> Accrual occurs "on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." . . .

*Hermitage Corporation v. Contractors Adjustment Company*, 166 Ill. 2d 72, 85, 86 (1995):

> When a plaintiff uses the discovery rule to delay commencement of the statute of limitations, the plaintiff has the burden of proving the date of discovery. . . .
>      . . .
> We hold, therefore, that when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed. . .

Additionally, when multiple plaintiffs are involved, proof is required for each plaintiff under both federal-and-Illinois law, *Zapp v. United Transportation Union*, 879 F.2d 1439, 1441 (7th Cir. 1989) (emphasis added):

Moreover, we stated that in cases involving multiple plaintiffs which have not been certified as class actions (such as the present case), <u>each individual plaintiff must adduce evidence demonstrating that he or she fit within the discovery exception</u>.

*Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 342 (1977) (emphasis added):

The commencement of the class action <u>suspends the applicable statute of limitations as to all asserted members of the class</u> who would have been parties had the suit continued as a class action. *American Pipe & Construction Company v. Utah* (1974), 414 U.S. 538, 554.

*Lloyd v. Treasurer of State of Illinois*, 401 Ill. 520, 527-28 (1948) (applying notice to each individual) (citations omitted, emphasis added):

Not only did Robert F. Brown's will breach the oral agreement of 1920 but, upon being admitted to probate in 1931, <u>gave Lee and Millie Jarrett notice</u> of the breach and, in addition, notice that no further improvements could be placed upon the property with any expectation of reimbursement therefor. . . . .
. . . <u>If Lee and Millie Jarrett had rejected</u> the provisions made by Robert F. Brown for them in his will <u>and had taken appropriate proceedings</u> to enforce the oral agreement, and had they been successful in this effort, . . . <u>Lee and Millie Jarrett did not elect so to do, and the time has long since passed for the assertion of rights</u> under the oral agreement of 1920. <u>The intervening petitioner is the widow of Lee Jarrett, the sole beneficiary and executrix of his will, and predicates her petition solely upon rights acquired from him. This being so, it follows necessarily that if the [so in original] and his sister, Millie, were barred by the Statute of Limitations, she is likewise so barred.</u>

*See also In re Sheehan's Estate,* 290 Ill App. 558, (1st Dist. 1937) (rejecting notice to a representative) ("The statute of limitations began to run against the infant and not against the guardian when the infant's cause of action accrued in the instant case . . ."); *cited with approval, Stanczyk v. Keefe,* 384 F.2d 707, 708-09 (7th Cir. 1967).

Stated another way, courts do not "reset the clock for each successive generation." *Bakalar v. Vavra*, 500 F. App'x 6, 8 (2d Cir. 2012) (applying notice to earlier generations).

Consequently, all claims but 3 years of copyright claims are barred (discussed below).

### b. The Lack Of Evidence.

#### 1. The Lack Of Evidence And The Estate's Admission.

No evidence exists of the relatives' knowledge of Mr. Darger, and the Estate's Administrator testified that she does not know what any of her relatives knew about Mr. Darger. Facts ¶ 6.

This lack of evidence bars tolling and resolves the statutes-of-limitations issue, which is discussed above.

Further and although unnecessary with the lack of Estate evidence, Ms. Lerner presents evidence documenting what the relatives knew or should have known.

### 2. *The Missing Half Of The Family.*

The second reason that tolling cannot apply arises from presents an odd twist to the evidence. The Estate relies on an heirship report (objection reserved), and the report admits that it could not identify half of Mr. Darger's relatives, Facts ¶ 11 (brackets in original, emphasis added):

> Within the authorization for this search, we have not been able to establish a place or a full date of birth for the Decedent's mother, Rosa Fullman Ronolds Darger [Burkeman]; <u>therefore, we have not determined whether the Decedent had any Maternal Aunts, Uncles or Cousins</u>.

No evidence of their identities exists otherwise.

If the court can't know the identities of this half of the relatives, it can't rule on what they knew or should have known. Consequently, the Estate cannot sustain its burden of proof for what the relatives knew or should have known for this-separate reason.

Adding to the odd twist is the fact that the report is not admissible because the Estate did not provide the author for a deposition. The Magistrate explained this last year to the Estate's earlier counsel and ordered the deposition, transcript (June 26, 2024 hearing) Dkt. 110, at 12-13 (emphasis added):

> THE COURT: <u>So the plaintiff, does plaintiff anticipate or does the estate</u>

anticipate using or calling her as a witness in the case or offering any reports or having her authenticate any documents?  Obviously she's not -- you know, if she can't be served with a subpoena for deposition in discovery but then she shows up at trial to testify or authenticate documents, I don't know.  So do you know whether you're going to be using her or her materials in any form at trial?

MR. HARRIS:  I do not know right now.  There's a possibility, certainly. With respect to, you know, the search establishing heirship, it was used in the probate case, but I don't know if we need it for this case.  So I don't know right now.

THE COURT:  All right.  Well, you should give some thought to that because if she's not going to be deposed, she may be excluded for all purposes as a witness at trial, right?  I mean, she may not -- she may have a right not to be deposed because I don't know if she's going to be subject to process.

But if she isn't, I think, you know, it's going to be unlikely that she would be permitted to just come in voluntarily and testify at trial, not having been deposed.

MR. HARRIS:  Understood.

transcript (July 16, 2024 hearing), Dkt. 111 at 7 (emphasis added):

THE COURT:  Well, here, let me -- that's just the update that you said last time.  I think you're just recounting the same discussion you told me.  So I will give you a deadline, and you must reach out to her and just get the answer.  Maybe her answer is: No, I'm not going to do it.

You know, if you have some interest in her because you want to use her at trial for some purpose, maybe you'll have some success in getting her to cooperate if it's in the estate's interest.  Perhaps you can have her do that, but you don't control her.  We just need an answer.

MR. HARRIS:  Right.

THE COURT:  Or Mr. Halprin needs an answer -- Mr. Hepplewhite.  It sounds like if she doesn't do it voluntarily there's no basis for me or any court in the United States to compel her to produce documents, so we're not going to have the discovery.

THE COURT:  So, Mr. Harris, I'll give you 14 days to get back to Mr. Hepplewhite with whether you are going to be able to secure her voluntary cooperation in producing documents or giving a deposition.

MR. HARRIS:  All right.

The basis for requiring her deposition is the need to establish "vigorous cross-examination" of adverse experts at trial, *e.g. Burton v. E.I. du Pont de Nemours and Company, Inc.,* 994 F.3d 791, 826 (7th Cir. 2021):

Although Rule 702 "places the judge in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions" but rather "the soundness and care with which the expert arrived at her opinion." *Schultz*, 721 F.3d at 431. "So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* (quoting *Daubert*, 509 U.S. at 596).

The report's admission of no knowledge of this half of the family defeats tolling of the statute of limitations without considering other evidence. Without the report, the Estate lacks evidence for tolling. Either way, the case must be dismissed on the statute of limitations.

Additionally, without the heirship report, the Estate cannot prove heirship.

### 2. Laches.

Laches, here, differs from the statute of limitations because the burden is on Ms. Lerner to prove the elements. That proof exists and is uncontradicted.

The elements of laches are, *Noland v. Mendoza*, 2022 IL 127239, ¶ 33 (citations and quotation marks omitted, italics in original): "(1) lack of due diligence by the party asserting the claim and (2) prejudice to the opposing party. Whether *laches* applies depends on the facts of each case." Laches does not apply to the copyright claim. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014).

Two types of evidence exist of the knowledge of Mr. Darger that his relatives knew or should have known, to establish lack of diligence, local publicity and the admissions of the Estate. Prejudice is obvious. The evidence is uncontradicted.

### a. Local Publicity.

Local publicity about Mr. Darger's art reasonably should have been know by relatives. The Administrator admitted in her deposition that many of the relatives meet several times a year for a breakfast in this area. Sadowski transcript, at 27, 33. Separately, most of the relative identified in the heirship report (objection reserved) live in the Chicago-and-northwest-Indiana area.

The *Chicago Tribune* and the *Chicago Sun-Times* published multiple newspaper articles about Mr. Darger and his art. Exhibit A. The articles included prominent placement and extensive discussions and photographs.

Mr. Darger's art was "first publicly displayed in 1977 at the Hyde Park Hyde Park Art Center in association with the Illinois Arts Council." Stipulation ¶ 19. The website, www.officialhenrydarger.com, lists the many books and exhibitions about Mr. Darger and his art. *Id.* 37.

Internet searches were not available in 1973, but they were available and easy to do later. They would have revealed at least the *Chicago Tribune* and *Chicago Sun-*Times articles as well as the website. Moreover, relatives are likely to have known their mother's maiden name or grandmother's maiden name if they had a credit card with security questions. To the extent that the Estate argues, Fact ¶ 27, 34 (regular breakfasts), one can fairly assume that they would have had incentive to and did investigate their family tree and reasonably would have known about Mr. Darger's art. Additionally, several family members were alive at the time of Mr. Darger's death as well as when the newspaper articles were published. Family tree, Exhibit B (objection reserved).

The family Bible produced by the Estate, Exhibit C, lists Ann Darger at the beginning of the family with her husband, Phillip Kein. Also, the Administrator admitted that she knew before talking with HeirSearch that her great grandmother was Annie C.M. Darger. Sadowski transcript at 78-79. This was Mr. Darger's sister, and a family tree from the heirship report is an exhibit (objections reserved), Exhibit B.

The Estate has not presented any evidence of what the relatives knew or should have known, and the Estate Administrator admits no knowledge. Facts ¶ 6. This uncontradicted

evidence is conclusive and requires summary judgment on the due diligence/knew-or-should-have-known element of laches.  It also applies to tolling evidence for the statute of limitations.

### b.  The Estate's Admissions.

The Estate's admits Mr. Darger's fame and the high demand for his art, Facts ¶¶ 12 (emphasis added):

> As you are aware, after his death Henry Joseph Darger left behind a body of drawings, paintings, writings, and collages (the "Work") which have achieved worldwide fame and acknowledgement for their artistic merit.  Mr. Darger has become a household name in the art world.
>
> The Work have [so in original] commanded ever higher prices at auction.  There is also high demand for reproductions and copies of the Work in books, films, advertisements, teaching materials and scholastic research.

Facts ¶ 13:

> Though Henry Darger's works were never exhibited, published, or commercialized during his lifetime, Darger has attained significant posthumous acclaim and renown. . . .

Consequently, the Estate argues from both sides of its mouth.  From one side, Mr. Darger's art is extremely well known when the Estate wants damages.  From the other side, none of the relatives knew anything about him when the Estate needs anonymity to beat the statute of limitations and laches.  The Estate's well-known argument creates evidence against its unknown argument.

### C.  Gift & Abandonment.

The uncontradicted evidence establishes Mr. Darger's gift of everything he owned to Mr. Lerner.  This usncontradicted evidence includes the Estate's failure to produce evidence and its admissions of no evidence.

To try to avoid this gift, the Estate argued and admitted in its Complaint that Mr. Darger told one of the eyewitnesses to "throw away" his art, expressly stating and apparently believing

this was a defense to a gift. The Estate's admissions of "throw away" and its-other admission of "left behind" establish conclusive evidence of abandonment under Illinois law, which separately defeats the Estate's claims, just as a gift does. Additionally and by law, the admissions cannot be contested with conflicting evidence.

Furthermore, if Mr. Darger's statements to Mr. Berglund and to Mr. and Ms. Lerner are not considered to create a gift, the Estate's admissions and these statements create abandonment – Mr. Darger left behind all of his possessions when he went to the nursing home hospital to die. No issues of fact exist. These two issues also support each other because they lead to the same place with different evidence and rules.

### 1. Gift.

#### a. The Uncontradicted Evidence.

Ms. Lerner's rightful possession/use of Mr. Darger's art arises from his gift of all his possessions in his room to his landlord, Nathan Lerner, when Mr. Darger went to the nursing home to die. When Mr. Darger gave Mr. Lerner all of his possessions in his former room, Mr. Darger knew that Mr. Lerner needed to clean out the room and to rerent it.[1] The Estate stipulates that it retains no evidence related to this gift. Stipulation ¶ 41. All its claims fail because the only evidence that exists is uncontradicted that Mr. Darger gave everything Mr. Lerner.

The evidence comes from two eyewitnesses who heard Mr. Darger in the nursing home (and to borrow a phrase from the play *Hamilton*, "were in the room") explain the same gift weeks before his death both time.

#### 1. The Two Witnesses Who Spoke With Mr. Darger.

Two eyewitnesses provide uncontradicted testimony about hearing Mr. Darger explain

---

1. Mr Lerner thought so much of his art that he did not rerent it and maintained it until his death. Stipulation ¶ 44. Much of the room's contents are now at the Intuit museum in Chicago. *Id.*

the same gift weeks before his death. This testimony is uncontradicted, conclusive, and establishes the gift.

David Berglund was Mr. Darger's neighbor and friend in the building, Facts ¶¶ 16-18; Stipulation ¶ 39, and was asked by Mr. Lerner to help clean Mr. Darger's room. *Id.* He stated in his notarized letter, Stipulation ¶ 39 (emphasis added):

> At some point I got around to talking about his room and its contents. I told him we were cleaning it and came across some paintings, that I couldn't bring myself to throw out. <u>The change in Henry was immediate; his eyes widened, he took a deep breath, paused for a moment and said "Its too late now," then softly, "they belong to Mr. Lerner."</u> With this he turned away and the continuation of any conversation seemed pointless. That was the last I saw of Henry.

Separately and earlier, Ms. Lerner was with Mr. Lerner in the nursing home when he spoke with Mr. Darger about his possessions and rerenting his room.[1] She stated, Stipulation ¶ 40, Lerner transcript at 40-41, 145-46 (emphasis added):

> [Ms. Lerner] After he moved there we used to visit him about average once a week because we used to go downtown for concerts a lot. <u>And at one point Nathan asked Henry that what do you want, is there anything you want from your room because we need to clean up for the next tenant to rent out. Henry said I don't need anything. It's all yours. I give everything in the room, it's yours. Throw them away for cleaning up purpose.</u>[1]
>     . . . .
>     Q  [Mr. Mandel] After he died. Very good. All right. Because paragraph 14 says before he died, your husband asked Mr. Berglund to help clear out the belongings, and they discovered drawings and literary works.
>     A  Okay. There is some discrepancy here.
>     Q  So which is the right one? No one new before he died or --
>     A  Nobody knew before he died.
>     Q  Yes.
>     A  <u>At the time Henry said -- and Nathan said do you want anything from the room.</u>
>     Q  Yes.
>     A  <u>And he said no, I have no use of it. It's all yours. Please clean the room.</u>1

Mr. Darger's reaction and words to Mr. Berglund document his understanding and gift. So does Mr. Darger's response to Mr. Lerner's question.

### 2.    The Estate's Admissions Of No Evidence.

Additionally, the Estate has admitted its lack of evidence.  The Estate's Administrator:

(1) admitted the Estate's lack of evidence now and previously:

> I don't have any evidence personally one way or another to factually state what happened.;
>  Q.  And you are not citing any other evidence other than your statement of proof, correct? A.  Correct.

(2) argued that the burden of proof was on Ms. Lerner prove the Estate's case:

> I believe the burden of proof is not on me to proof [so in original] that.; and
> I believe that the burden of proof for that ["that Mr. Darger did not either give his art to Mr. Lerner or tell Mr. Lerner it can be thrown away"] was going to come out of discovery." . . . . and

(3) admitted no evidence before filing by stating that if any evidence of Mr. Darger not giving his

art to Mr. Lerner existed that it would come from Ms. Lerner:

> I believe that . . . and if there was evidence of it ["that Mr. Darger did not either give his art to Mr. Lerner or tell Mr. Lerner it can be thrown away"]it would be produced by Ms. Lerner:

Sadowski transcript at 116-18, 120-21 (emphasis added):

> Q.   Why do you believe that Mr. Darger's art belongs to the Estate?
> MR. HARRIS:  Same objection.  Go ahead.
> THE WITNESS:  Okay.  I believe we are all the same basis that is consistent with the argument that we filed.
> BY MR. HEPPLEWHITE:
> Q.   So everything that's in the complaint is the basis for your belief?
> A.   Correct.
> Q.   Why do you believe that Mr. Darger did not give his art to the Lerners?
> MR. HARRIS:   You can answer the question.
> THE WITNESS:  I personally do not know that.
> BY MR. HEPPLEWHITE:
> Q.   You personally don't know that he gave it to them or you personally don't know why?
> A.   I personally don't know what happened either way.
> Q.   Okay.  So if you don't personally don't know what happened either way you believe it is justified for the Estate to have the art but you believe it is unjustified for Ms. Lerner to have the art?
> MR. HARRIS:   Objection to the form of the question.
> MR. HEPPLEWHITE:   Look, I'm just saying I want to give her a chance to be consistent, that's all.

Q.   Is it your position that you don't know what happened either way and so, therefore, you can't say it is justified either way?

MR. HARRIS:   Objection to the form of the question.  Go ahead.

THE WITNESS:   I don't have any evidence personally one way or another to factually state what happened.

. . . .

Q.   What evidence do you believe that Mr. Darger did not either give his art to Mr. Lerner or tell Mr. Lerner it can be thrown away?

MR. HARRIS:   Objection to the form of the question.  You can answer it.

THE WITNESS:  I believe that the burden of proof for that was going to come out of discovery, and if there was evidence of it it would be produced by Ms. Lerner.

BY MR. HEPPLEWHITE:

Q.   Don't take this wrong, I asked you to specify the evidence as opposed to giving a legal lecture.

What is the evidence that you believe that Mr. Darger did not give his art to either Nathan Lerner or Kiyoko Lerner?

MR. HARRIS:  Object to the form of the question, it is compound, it asks for a legal conclusion and it has been asked and answered twice, and she has provided an answer.

MR. HEPPLEWHITE:   It hasn't.  You can answer.

MR.  HARRIS.:  You can answer the question.

THE WITNESS:   I believe the burden of proof is not on me to proof  [so in original] that.

Q.   And you are not citing any other evidence other than your statement of proof, correct?

A.   Correct.

Additionally, the Estate stipulates:  "The parties are not aware of any other witness to any statement from Darger concerning the disposition of his personal and/or intellectual property." Stipulation ¶ 41.  No evidence exists within the discovery to contradict the Administrator's admission of no evidence of it.

Beyond these admissions of no evidence and the lack of evidence, the Administrator's testimony explains in two ways why the Estate's lack of evidence and why the court needs to enter summary judgment here.

First is the Estate Administrator's mistaken belief that Ms. Lerner bears the burden of proof, Facts ¶ 8, 9:

> the burden of proof is not on me to proof [so in original] that ["that Mr. Darger did not give his art to either Nathan Lerner or Kiyoko Lerner"].

The Administrator started and continued this case thinking that she didn't have to prove anything.

Second, the Administrator specifically stated that the evidence conflicting with a gift and "throw away" "would be produced by Ms. Lerner," not by the Estate, Facts ¶ 10 (emphasis added):

> I believe that the burden of proof for that <u>was going to come out of discovery</u>, <u>if there was evidence of it</u> ["that Mr. Darger did not either give his art to Mr. Lerner or tell Mr. Lerner it can be thrown away"] it would be <u>produced by Ms. Lerner</u>.

The Estate never had any evidence before filing. Facts ¶ 7:

> I don't have any evidence personally one way or another to factually state what happened.

However, the Estate knew before filing about Ms. Lerner's consistent explanation of Mr. Darger's gift, Facts ¶ 1 (emphasis added):

> 122. The Estate has demanded the return of the property from Defendants. (Exhibit 6).
> [Exhibit 6:]
> <u>Moreover, representations that you (and your husband) have made that Mr. Darger granted you all property rights in and to the Work are contradicted by contemporaneous accounts.</u>[2]
>
> ———————————
> 2. Mr. Darger told David Berglund weeks before his death (a neighbor of Mr. Darger's, hired by Nathan Lerner to clean Mr. Darger's room after Mr. Darger was moved to a care facility) to throw away all of his paintings and manuscripts. . . . .

The Estate was and has been hoping to find something to support its demands to Ms. Lerner and the museums. It had no evidence conflicting with a gift then and has nothing more now. This is why the court is presented now with no evidence and the need to enter summary judgment. The issue of whether this approach was appropriate is reserved.

**_b._**    **_The Law._**

17

### 1. *The Law Governing Uncontradicted Evidence.*

The law of uncontradicted evidence for summary judgments is basic and longstanding: no evidence to support a claim requires dismissal on the merits. *E.g. Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679 (7th Cir. 2023) (no evidence of the medical condition compartment syndrome); *Hadley v. Du Page County*, 715 F.2d 1238, 1243 (7th Cir. 1983) (no evidence of an unwritten grievance procedure).

As discussed above, the Estate lacks any evidence of Ms. Lerner's wrongful possession and control and admits the lack of evidence. The only evidence that exists – which comes from people in the room with Mr. Darger – establishes Mr. Darger's gift. Consequently, Ms. Lerner proves her ownership of Mr. Darger's art, which defeats all the Estate's claims.

### 2. *The Law Governing Mr. Darger's Statements.*

Under the December 1, 2024 revision to the Federal Rules of Evidence 801(d)(2) and Rule 803(2), (3), the testimony of Ms. Lerner and Mr. Berglund is not hearsay and is admissible for the truth and Mr. Darger's state of mind.

The statements of Mr. Berglund would be admissible under Illinois law for the truth, *e.g. People v. Peterson,* 2017 IL 12033 ¶¶ 68-73 (2017) (admission of the statements of the deceased by three non-parties), and he is not subject to the Illinois dead-man's prohibition. Similarly, the statements of Mr. Berglund and Ms. Lerner would be admissible under Illinois law for Mr. Darger's state of mind. *E.g. In re Estate of Michalak*, 404 Ill. App. 3d 75, 95 (1st Dist. 2010) ("We discern that none of these statements were offered to prove the truth of the matters asserted, but rather Michalak's mental capacity to gift her residence to the Kaletas."); Ill. R. Evid. 803(3).

The parties have stipulated to foundation for all documents and information provided and

produced in discovery.  Stipulation ¶ 8.

### 2.    *Abandonment.*

#### a.    *Introduction.*

Summary judgment is required separately from the gift because of abandonment, and the Estate's admissions establish abandonment, which also proves/creates Ms. Lerner rightful possession of Mr. Darger's art and leads to the same result as the gift.

The Estate admitted that Mr. Darger:

> chose "to throw away all of his paintings and manuscripts," Facts ¶ 1;
> "left behind [his art]," Facts ¶ 2*; and*
> "made no arrangements before his death for the disposition of any or all of his [art and interests in it] after his death." Facts ¶¶ 3, 4, *also, id.* ¶ 5, ("personal property").

A plaintiff can "plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Soo Line Railroad Company v. St. Louis Southwest Railway Company,* 125 F.3d 481, 483 (7th Cir. 1997).  These admissions "plead [the Estate] out of court," *id.,* because:

> admissions in pleadings are judicial admissions, which are conclusive and cannot be contradicted;
> documents attached to and relied on in a pleading constitute part of the pleading and control when in conflict with the pleading;
> the admissions "threw away" and "left behind' describe and create abandonment, which relinquishes all rights to the property and defeat the Estate's claims; and
> the admission of "made no arrangements" confirms these admissions and prevents any argument that Mr. Darger made arrangement for his possessions, including his Art, that could create mislaid/forgotten property under Illinois law.

#### b.    *The Law Governing Admissions.*

Admissions arise from pleadings and from Rule 36 of the Federal Rules of Civil Procedure.  *Reynolds v. Commissioner*, 296 F.3d 607, 612 (7th Cir. 2002).

Federal Rule of Civil Procedure 10(c) (December 1, 2007) specifically states:  "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."

Admissions in pleadings are judicial admissions, which create binding, conclusive facts and bases to dismiss a case, *e.g. Soo Line,* 125 F.3d at 483 (7th Cir. 1997) (citations omitted):

> The Soo has fallen victim to the well-settled rule that a party is bound by what it states in its pleadings. "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." A plaintiff can "plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." . . .

Admissions in complaints and their exhibits also bar the use of contrary evidence, *Keller v. United States*, 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995):

> Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are "not evidence at all but rather have the effect of withdrawing a fact from contention." Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6726 (Interim Edition); *see also* John William Strong, *McCormick on Evidence* § 254, at 142 (1992). . . .

Admissions within exhibits that contradict allegations overrule the allegations and require dismissal, *e.g. Polzin v. Gage*, 636 F.3d 834, 838 & n.1 (7th Cir. 2011) (emphasis added):

> The same absolute immunity does not extend to the court reporter. [citation omitted] Mr. Polzin's contention against the court reporter nevertheless fails. <u>The portions of the transcripts that Mr. Polzin supplied to the district court illustrate that the court reporter in fact transcribed the state trial judge's doubts about the thoroughness of the special prosecutor's investigation. Mr. Polzin's exhibits are part of his complaint. Fed.R.Civ.P. 10(c). Because these attached exhibits contradict his claims, the district court was entitled to rely on them in dismissing the allegations against the court reporter.</u>[1]
>
> _____
>
> 1. *See Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.,* 474 F.3d 463, 466 (7th Cir. 2007) (concluding that the district court properly relied upon contracts attached to the complaint even when the contracts contradicted the complaint); *Flannery v. Recording Indus. Ass'n of America,* 354 F.3d 632, 638 (7th Cir. 2004) (<u>"[W]hen a document contradicts a complaint to which it is attached, the document's facts or allegations trump those in the complaint."</u>).

The standard to determine if the admissions within a document conflict is if the plaintiff "relied upon" the document as a basis of its claim, *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455-56 (7th Cir. 1998):

In this case, NIGOS included Hedman's letters in the complaint to establish that Century Center sent it letters regarding the policy after the 1994 show and again in 1996. The letters themselves are not at issue in NIGOS's suit, which is based on why and how Century Center adopted the no firearm and ammunition policy. This difference distinguishes NIGOS's suit from the cases in which we have decided that documents written by a defendant and incorporated into the pleadings by a plaintiff trump allegations in the complaint. For example, in *Wade*, this Court affirmed the District Court's conclusion that the plaintiffs' Freedom of Information Act claim, which alleged that an agency improperly withheld records from them, was baseless. We looked not only at the letter by the defendant, but also at statements made by an employee of the defendant that had been incorporated by reference into the pleadings. The plaintiffs alleged that the statements contradicted the letter, thus demonstrating that the agency had engaged in a coverup. Taken together, however, we concluded the statements and letter did not contradict one another. The statements did not suggest that the agency possessed the documents as the plaintiffs alleged they did. Thus, the employee did not contradict the letter, as the plaintiffs suggested. The information in these documents did not demonstrate that the inferences the plaintiffs believed we should draw from them were reasonable. The plaintiffs relied upon these documents to form the basis of their claim, but because the documents do not support it, we found dismissal appropriate. *See Wade,* 969 F.2d at 249–50. Unlike the plaintiffs in *Wade*, NIGOS did not rely upon Hedman's letters to establish the basis for its claim. Simply put, it did not attach Hedman's letters to show that Century Center adopted the no firearm and ammunition policy in order to suppress the organization's constitutional rights. Rather, it submitted the letters to establish that Century Center sent letters to NIGOS and that Century Center's new policy forbade firearms and ammunition inside the facility.

In *Matter of Wade*, 969 F.2d 241, 249-50 (7th Cir. 1992), which is discussed above in

*Northern Indiana,* the Seventh Circuit also ruled on a letter attached to the complaint (as here),

determined that the substance of the letter conflicted with the complaint, ruled that it created

conclusive, fatal judicial admissions, and dismissed the complaint (emphasis added):

The Wades filed an amended complaint, attaching the Logan letter which stated that the EOUST found no documents responsive to their requests. A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment. *Early v. Bankers Life and Casualty Co.,* 959 F.2d 75, 79 (7th Cir. 1992). The Logan letter, discussed in paragraph 4 of the amended complaint, directly contradicts the alleged statements by a different EOUST official that are alleged in paragraph 3. The Wades allege that the Logan letter is evidence of a coverup, not support for the government's claim of a satisfaction of the FOIA search. The district court characterized these allegations as "fueled by innuendo, speculation, and are wholly unsupported by the record."
We agree that the allegations are baseless. . . .

21

The court in *Wade* also ruled that the court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim," *id.* at 250 – a likely request by the Estate.

### c.  The Law Governing Specific Admissions.

### 1.  "Left Behind."

The Estate specifically alleged that Mr. Darger "left behind" all of his art in his room, Facts ¶ 2 (emphasis added):

> 3.  As an artist, Darger was virtually unknown during his lifetime.  <u>He left behind</u> an extensive oeuvre of drawings, paintings, collages, and literary works.  His works are known for . . . .

This constitutes a judicial admission from a pleading.

### 2.  "Throw Away."

### i.  The Admission.

The Estate specifically stated in the Complaint that Mr. Darger told Mr. Berglund to "throw away" his art as the basis to argue that the Lerners falsely represented his gift, Facts ¶ 1 (emphasis added):

> 122.  The Estate has demanded the return of the property from Defendants. (Exhibit 6).
> [Exhibit 6:]
> <u>Moreover, representations that you (and your husband) have made that Mr. Darger granted you all property rights in and to the Work are contradicted by contemporaneous accounts.</u>[2]
> _____
> 2.  <u>Mr. Darger told David Berglund weeks before his death</u> (a neighbor of Mr. Darger's, hired by Nathan Lerner to clean Mr. Darger's room after Mr. Darger was moved to a care facility) <u>to throw away all of his paintings and manuscripts.</u> . . . .

This constitutes a judicial admission from an exhibit to a pleading.

### ii.  The Pleading Law Applicable
### To The "Throw Away" Admission.

The letter was alleged as an exhibit to an allegation of the conversion Count, Exhibit F,

¶¶ 1-124 (118-24), and used to support the four elements of the conversion claim, including the fourth element, wrongful "control, dominion, or ownership over the property," *Loman v. Freeman*, 229 Ill. 2d 104, 127 (2008) (citation omitted, emphasis added):

> To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.

The letter also was alleged to support the other allegations of the Complaint because the conversion count realleges all the allegations within the Complaint. Exhibit F, ¶ 117 ("realleges and incorporates each and every allegation in the paragraphs above") *quoted below*.

The letter states that Mr. and Mrs. Lerner's gift statements "are contradicted by contemporaneous accounts" and that "Mr. Darger told David Berglund weeks before his death . . . to throw away all of his paintings and manuscripts."[2]

The Complaint repeats the allegations of the letter generally, with continual allegations of Ms. Lerner's wrongful possession and use, and specifically, by alleging that their "gift[]" statements were "false," Exhibit F, ¶ 44 ("under the false pretense that Darger had gifted her and Nathan Lerner").[2]

The letter was used to set out the reasons/bases for its demands to Ms. Lerner, the museums, and the galleries to return Mr. Darger's art and to pay the Estate.[2]

The Estate's "throw away" argument, however, was wrong, legally,[2] and conflicts with the conversion claim and all-the-other claims.

The Estate was not required to attach the letter. Its details require dismissal.[2] In this

---

2.    The Estate's counsel probably believed at the time of his letter that Mr. Darger's instruction to Mr. Berglund to "throw away" his Art created a defense to the gift. Ms. Lerner asserts this misunderstanding of the Estate's counsel as the reason the letter was used to support the allegations of the Complaint. The letter was written before Ms. Lerner's counsel transmitted to the Estate's counsel the (now-inconvenient) Illinois law governing abandonment, "throw away," and left behind," which is discussed here. This law establishes that the admission of "throw away" creates Mr. Darger's abandonment and establishes Ms. Lerner's rightful possession.

regard, the Seventh Circuit specifically recognizes that, *Soo Line,* 125 F.3d at 483 (7th Cir. 1997) (citation omitted, emphasis added):

> [a] plaintiff can "plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." . . . .

As in *Wade* and *Northern Indiana,* here the court will determine if "[t]he plaintiffs relied upon these documents to form the basis of their claim [and if] the documents do not support it." *Northern Indiana,* 163 F.3d at 456. The letter was used here to support[2] the allegations of the Complaint. As in *Wade* but unlike *Northern Indiana*, the Estate's letter conflicts with the allegations of the Estate's Complaint because the "throw away" argument[2] conflicts with the conversion claim and with the other claims within the Complaint. Consequently, the "throw away" argument[2] constitutes an admission that establishes Ms. Lerner's rightful ownership.

The allegations from the conversion claim that the letter supported,[2] are Exhibit F, ¶ 117, *also and not quoted* ¶¶ 119, 121-23 (emphasis added):

> The Estate realleges and incorporates <u>each and every allegation in the paragraphs above</u> as if they were fully set forth herein.

and from other allegations of the Complaint are, Exhibit F, ¶¶ 44, 52, 108, *also and not quoted* ¶¶ 6, 7, 9, 83, 97, 98, 109, 119, 121, 123 (emphasis added):

> 44. . . .<u>under the false pretense that Darger had gifted her and Nathan Lerner</u> . . . .;
> 52. . . .Defendants <u>had and continue to have a bad faith intent</u> to profit . . . .; and
> 108. . . . the Estate of Nathan Lerner, Lerner, and the Foundation <u>continue to falsely hold themselves out as the valid copyright holders</u> . . . .

Also, other parts of the letter, itself create more evidence of the Estate's use of the letter to support[2] its allegations of no "gift[]" and "throw away." The letter recited multiple times the arguments of "throw away" being the truth[2] and the "gift[]" being "fraudulent[],"[2] Exhibit F, Dkt., 1-6 at 1 ("Misappropriation and Unauthorized Commercial Exploitation," "unauthorized exploitation"), 2 ("unauthorized exploitation," "significant liability"), 3 ("fraudulently authorized

to exploit," "against you").

### iii.    The Common-And-Legal Meanings Of "Throw Away" & "Left Behind."

Both the common definitions and Illinois law define the acts and admissions of "throw away" and "leave behind" as "abandonment:"

WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1, 481, 491 (4th ed. 2000) (bold in original, underline added):

> **throw away** *vt* **1 a :** to get rid of as worthless or unnecessary **b** DISCARD 1b **2 a** to use in a foolish or wasteful manner **:** SQUANDER **b** to fail to take advantage of **:** WASTE **e :** to make (as a line in a play) unempathetic by casual delivery

> [1]**aban·don** \ ə-'band-dən \ *vt* [ME *abandounen*, fr. MF *abandoner*, fr. *abandon*, n., surrender, fr. *a bandon* in one's power] **1 :** to give up with the intent of never again claiming a right or interest in   **2 :** to withdraw from often in the face of danger or encroachment <∼ ship>   **e :** to withdraw protection, support, or help from **:** DESERT   **4 :** to give (oneself) over to a feeling or emotion without check, restraint, or control   **5 a :** to cease from maintaining, practicing or using   **b :** to cease intending or attempting to perform — **aban·don·er** n — **aban·don·ment** \ -mənt \ *n*

> [1]**leave**\'lēv\ *vb* **left** \'left\ **leav·ing** [ME *leven,* fr. OE *lǣfen:* akin to OHG *verleiben* to leave, OE *belīfan* to be left over, Gk *lipos* fat] *vt* **1 a :** BEQUEATH **b :** to depart without removing <something caused or brought> <wound ∼*s* a scar> <mailman *left* a letter>   **c :** to fail to take or refrain from taking <∼ her at home>   **d :** to allow to remain in a specified state or undisturbed <∼ the door open>   **e :** to have as a remainder <4 from 7 ∼*s* 3>   **2 a :** to go away from **:** DEPART <∼ town>   **b :** DESERT, ABANDON   <*left* his wife>   **c :** to give up **:** RELINQUISH <*left* business for research> ∼*vi* **:** to set out **:** DEPART   **syn** *see* GO — **leav·er** *n*

*People v. Hoskins*, 101 Ill.2d 209, 219-20 (1983) ("left behind," "threw it away," and "abandoned") (citations omitted, emphasis added):

> The defendant either dropped or threw her purse to the ground as she fled from the police officers.   In either event it can be said that she abandoned it. If dropped unintentionally, she made no effort to pick it up.   She obviously intended to flee and escape and not return for the purse.   The intent at that time was to abandon it. If she deliberately threw it away so she would not be found in possession of the drugs, the purse would also of course be judged to have been abandoned. "[E]ffects have been held to be abandoned when they were thrown from a moving car or motorcycle, when they were dropped to the ground by a pedestrian, when they were left behind in a place accessible to the general public, and when they were thrown out of the window of a

residence."  Certainly the defendant did not retain, but rather gave up, any expectation of privacy in the purse and its contents.  She could not have an expectation that a purse lying in a public street would not be picked up and examined.

*People v. Brasfield*, 28 Ill.2d 518, 519–20 (1963) ("threw away" and "abandoned")

(citations omitted, emphasis added):

> The defendant argues that his arrest was illegal and that therefore seizure of the property was illegal.  <u>He does not rely upon the constitutional provisions forbidding unreasonable searches and seizures, for he concedes that there was no search here.</u>  The defendant's argument is that property obtained as a result of an illegal arrest, without a search, is inadmissible.  We do not find it necessary to decide this question.  The officers were unanimous in their testimony that <u>the defendant threw away the package</u> as they approached him. . . .  These arguments are not persuasive in view of the testimony of the officers that the defendant was not arrested until after he had <u>thrown the package</u>.  The trial court was entitled to believe this testimony and to act upon it.  Under similar circumstances the United States Supreme Court has held that property <u>abandoned</u> by a defendant as he fled from approaching officers was properly seized and admitted in evidence.

Additionally and consistent with the common definitions and the law, Illinois law also specifically defines "waiver" to include both "abandon" and "throw away," *People v. White*, 146 Ill. App. 3d 998, 1001 (4th Dist. 1986) (citations omitted, emphasis added):

> Waive is defined as: "<u>To abandon, throw away</u>, renounce, repudiate, or <u>surrender a claim</u>, a privilege, <u>a right, or the opportunity</u> to take advantage of some defect, irregularity, or wrong.  <u>To give up right or claim voluntarily."</u>

This definition of "waiver" reinforces the "throw away" law and the common definitions discussed above because one, fairly, waives all one's rights in an object when one "throw[s it] away" – just as one does when one "abandon[s]" it.

The persuasive power of all this law, these admissions, and these definitions is particularly strong because the Estate chose the words "throw away" and "left behind."

### 3.        *"Made No Arrangements Before His Death."*

The Estate specifically admitted in responses to requests to admit that Mr. Darger "made no arrangements before his death for the disposition of any or all of his [art materials, interests in

26

his art materials, and personal property] after his death," Facts ¶¶ 3-5:

> "Admit": "12. Henry Darger, Jr. made no arrangements before his death for the disposition of any or all of his art materials after his death."
> "Admit": "13. Henry Darger, Jr. made no arrangements before his death for the disposition of any or all of his interest in all his art materials after his death."
> "Admit": "14. Henry Darger, Jr. made no arrangements before his death for the disposition of any of his personal property, including but not limited to all his art materials, after his death." (strikeouts in original).

These constitute judicial admissions under Federal Rule of Civil Procedure 36.

### d.     The Law Of Abandonment.

Abandoned property belongs to the finder under Illinois law, and abandonment legally removes the property from the estate of the person who abandons it (like a gift), *Paset v. Old Orchard Bank & Trust Company*, 62 Ill. App. 3d 534, 537 (1st Dist. 1978) (emphasis added):

> We are not concerned in this case with abandoned property where the owner, intending to relinquish all rights to his property, leaves it free to be appropriated by any other person. Although at common law the finder is entitled to keep abandoned property, the plaintiff has not taken the position that the money here was abandoned.

*e.g., Hazelbaker v. Goodfellow*, 64 Ill. 238, 240-41 (1872) (emphasis added):

> The act of 1869 declares that a married woman shall be entitled to receive and possess her own earnings and sue for the same in her own name, free from the interference of her husband and his creditors, but it provides that she shall have no compensation for labor performed by her minor children or husband.
> Under this enactment, we can entertain no doubt that where the husband deserts his wife and children, that all of her earnings, together with those of the children, are free from liability to be subjected to the debts of the husband. When he abandons them, he at the same time abandons all claim to their labor and their earnings. The act of 1869 was manifestly intended to embrace such a case. After such an abandonment, it can not be said that the wife continues to labor for him; and in supporting and caring for the minor children, she must be held entitled to their earnings. . . . .

As a related principle, abandonment of an object removes all the protections provided to the previous owner for the object. *People v. McBee*, 228 Ill. App. 3d 769, 780 (1st Dist. 1992) ("Once the bags were abandoned, the officers did not need a search warrant to search the bags.").

*People v. Hoskins*, 101 Ill.2d 209, 219-20 (1983) (using "left behind," "threw it away" as

descriptions of "abandon"); *People v. Brasfield*, 28 Ill.2d 518, 519–20 (1963) (using "threw away" as a description of "abandon"). The protections are removed because all rights to the object were given up.

The standards for abandonment are action, intent, and proof by convincing-and-unequivocal evidence, which often is proved by circumstantial evidence, *e.g., Creative Vistas, Inc.*, 2017 IL App (1st) 161772-U, ¶ 11 (citations omitted, emphasis added):

> The trial court ruled that Creative had failed to abide by the agreement finding that Kolin provided full access to the property no later than January 19, but Creative took no action to remove the property between then and the initial due date of February 11. The court ruled that Creative therefore abandoned its property. Abandonment is generally defined as an intentional relinquishment of a known right. To prove abandonment, a party must show both an intent to abandon and acts carrying that intent into effect. Abandonment can be express or implied and often must be proved by circumstantial evidence of intent, as direct evidence is rare. Generally abandonment is not presumed, and the party seeking to declare an abandonment must prove by convincing and unequivocal evidence that the abandoning party intended to relinquish ownership. . . .

The Estate's lack of evidence and its admissions create convincing evidence. The lack of conflicting evidence creates unequivocal evidence.

A separate basis to create abandonment arises the presumption that exists and that creates a prima facie case for matters found on the landlord's property, which requires that the adverse party present evidence or lose without it, *e.g., Bishop v. Ellsworth*, 91 Ill. App. 2d 386, 391-92 (3d Dist. 1968) (citations omitted, emphasis added):

> There is a presumption that the owner or occupant of land or premises has custody of property found on it or actually imbedded in the land. The ownership or possession of the locus in quo is related to the right to possession of property discovered thereon or imbedded therein in two respects. First, if the premises on which the property is discovered are private it is deemed that the property discovered thereon is and always has been in the constructive possession of the owner of said premises and in a legal sense the property can be neither mislaid nor lost. Second, the question of whether the property is mislaid or lost in a legal sense depends upon the intent of the true owner. The ownership or possession of the premises is an important factor in determining such intent. . . .

*e.g., McElroy v. Force*, 38 Ill. 2d 528, 532–33 (1967) (citations omitted, emphasis added):

> A rebuttable presumption, such as exists here, is not evidence in itself, but arises as a rule of law or legal conclusion from facts proved. These presumptions 'do not shift the burden of proof. <u>Their only effect is to create the necessity of evidence to meet the Prima facie case created thereby, and which, if no proof to the contrary is offered, will prevail.'</u>  <u>Stated differently, the presence of a presumption in a case only has the effect of shifting to the party against whom it operates the burden of going forward and introducing evidence to meet the presumption.</u>  If evidence is introduced which is contrary to the presumption, the presumption will cease to operate.  <u>However, where there is an absence of evidence to the contrary, the prima facie case created under the presumption will support a finding.</u>

Here, the Estate has no rebuttal evidence and admits the lack of it.  Stipulation ¶¶ 38  (no writing), 41 (no statements).

To deny abandonment in this case would turn landlord-tenant law upside down. Landlords would have to spend their time chasing relatives to return furniture, pots, and pans left in apartments.

### e.        Abandonment And The Alternatives Under Illinois Law.

Illinois recognizes three alternatives for Mr. Darger's property/art here: (1) mislaid/forgotten; (2) lost; and (3) abandoned.  Each is different and treated differently, *e.g., Paset*, 62 Ill. App. 3d 534, 537 (1st Dist. 1978) (citations omitted, emphasis added):

> <u>Traditionally, the common law has treated lost and mislaid property differently for the purposes of determining ownership of property someone has found.  Mislaid property is that which is intentionally put in a certain place and later forgotten</u>  The element of intentional deposit present in the case of mislaid property is absent in the case of lost property, for property is deemed lost when it is unintentionally separated from the dominion of its owner.  The general rule is that the finder is entitled to possession of lost property against everyone except the true owner.  <u>We are not concerned in this case with abandoned property where the owner, intending to relinquish all rights to his property, leaves it free to be appropriated by any other person.  Although at common law the finder is entitled to keep abandoned property, the plaintiff has not taken the position that the money here was abandoned.</u>

The facts do not support the Illinois law for the two alternatives to abandonment:

mislaid/forgotten and lost.  Only abandonment is justified.

For mislaid/forgotten to apply under Illinois law, Mr. Darger would have to have made some arrangements to "intentionally put [his art] in a certain place and later [to have] forgotten [about it]." *Id.*  As a matter of common sense, one does not mislay/forget or lose one's home of 40+ years.  Also, he did not mislay/forget about or lose the art of one's life, which was important enough to him that he displayed some it on the walls of his home, Facts ¶ 14.  Also, the Estate's admission of "made no arrangement," *id.* ¶¶ 3-5, conflicts conclusively with any intent of Mr. Darger to place his art somewhere and forgetting it, and contrary evidence is barred, *Keller,* 583 F.3d at 838, n.8 *and accompanying text*, and the Estate retains no contrary evidence.

Further, the sheer amount of his art, approximately 300 drawings and the 15,000+-page book, Stipulation ¶ 9, and which was the art of his life, could not have been mislaid/forgotten or lost.  Instead, Mr. Darger left everything, not just his art.  Facts ¶¶ 3-5, ( made no arrangements . . . for . . . his personal property.").  Leaving everything is expected with abandonment before going to the nursing home to die.

For lost to apply, the property must be "unintentionally separated from its owner." *Passet,* 62 Ill. App. 3d at 537.  The evidence of Mr. Darger's separation from his possessions, including his art, is one-sided and conflicts conclusively with this conclusion.  Mr. Darger knew that he was leaving his room of 40+ years when he went to the nursing home to die, and specifically stated that he left all his possessions.  Also, he had the "last clear chance" to change his mind twice, once with Mr. Lerner and once with Mr. Berglund.  Also, one is not "unintentionally separated" from things that one "left behind" or tells another to "throw away." These admissions are conclusive and bar contrary evidence, *Keller,* 583 F.3d at 838, n.8 *and accompanying text*, which also is lacking here.  Beyond these matters, the Estate retains no

contrary evidence.

This abandonment analysis exists in parallel to analysis of the uncontested evidence of a gift, which is discussed above.  Each analysis is conclusive alone, and they reinforce each other in non-legal way – no conflict exists about Ms. Lerner's rightful ownership from two unrelated analyses based on different evidence and law.

### D.    Additional  Matters.

#### 1.    Intentional-Misconduct  Allegations.

Two Estate discovery responses establish that the intentional-misconduct allegations lack any evidence, its response to the request to admit and its document list.  They are uncontradicted and confirmed by Judge Finnegan to be conclusive.

##### a.    The Conflicting Response To The Request To Admit.

First, the Estate answered a request to admit by stating that it lacked sufficient information to admit or deny that the Lerners relied on Mr. Darger's statement that he gave his art materials to Mr. Lerner, Motion to Adjudicate Requests To Admit, Dkt. 66-1 at 10 (response to request to admit 25 attached to Facts) (emphasis added):

> **REQUEST FOR ADMISSION NO. 25:** Nathan Lerner and Kiyoko Lerner relied on Henry Darger, Jr.'s statement while he was in the facility at which he died that Mr. Darger gave all of his art materials to Nathan Lerner at all times that they took control of all of Mr. Darger's art materials.
> **ANSWER:** Plaintiff objects on the ground that the Request <u>seeks facts about the subjective state of mind of the Defendants which Plaintiff does not know</u>.  Plaintiff denies that "Mr. Darger gave all of his art materials to Nathan Lerner at all times that they took control of all of Mr. Darger's art materials." Therefore, Plaintiff denies this Request.

Because the Estate lacked information to admit or deny this reliance, it could not have had any objective basis to allege any intent for the alleged intentional misconduct.  Also, contrary evidence is barred by the admission.  *Keller,* 583 F.3d at 838, n.8 *and accompanying text*.

Furthermore and powerfully, the comments of Judge Finnegan about this response emphasize the lack of a reasonable basis for the intentional-misconduct allegations, transcript (Feb. 21, 2024 hearing), Dkt. 84, at 40:

> MR. HEPPLEWHITE:  That's my problem, because he has in his complaint alleged many allegations about state of mind, intentional misconduct, and that's why I think that objection is not well-founded.
> Also, it's a factual question.  A lot of cases turn on a jury's determination of state of mind.  So the fact that he has alleged intentional misconduct in the allegations that we've previously -- in the allegations associated with the request for production that we previously adjudicated is inconsistent with objecting here: Oh, I can't know her state of mind.  You've been saying she has this state of mind.
> THE COURT:  Look, that's perfect for you then.  You're going to have a request to admit and an answer that says they don't know and they can't know state of mind. That's going to be great for you.  Then you're going to stand up and say: And here they are telling you they have this state of mind.  Okay?

As an incidental matter, the Estate's revised answer (quoted above) failed to remove the last sentence, as Judge Finnegan ordered, transcript (Feb. 21, 2024 hearing), Dkt. 84, at 38 (emphasis added):

> MR. HEPPLEWHITE: I'm sorry, Judge. I did not understand what counsel said about what he was agreeing to.
> THE COURT: He's agreeing that he has to give a new answer that takes out the last sentence --
> MR. HEPPLEWHITE: Okay.
> THE COURT: -- that says:  "Therefore, plaintiff denies this request."  But otherwise, it stands as is. In other words, you were --
> MR. HEPPLEWHITE: Yeah, I'm fine.
> THE COURT: Okay. You got it.

Beyond the law governing the admissions and as a matter of common sense, Ms. Lerner cannot be guilty of any intentional misconduct after:  (1) hearing Mr. Darger tell her husband that he could have everything and could rerent the room, Stipulation ¶ 40, and (2) receiving Mr. Berglund's letter, Stipulation ¶ 39.  This evidence is uncontested and conclusive that all she knew was that Mr. Darger gave it to Mr. Lerner.

### b.     *The Lack Of Documents And Other Evidence.*

Second, the Estate referenced only documents when responding to discovery that requested information and documents to support the intentional allegations. Exhibit E. The Estate agrees that none of the documents provide evidence of Ms. Lerner's intentional misconduct, only intentional conduct. This also binds the Estate and, alone, conclusively defeats the allegations.

The interrogatory and its companion request to produce state:

> 7.    Each statement and document that was or is refers or relates to a basis for each the allegations of the Complaint or for each part of the Estate's response to motion to dismiss that is set out below:
>
> a. "Defendants had and continue to have a bad faith intent to profit from the "officialhenrydarger.com" domain name," within paragraph 108 of the Complaint, Dkt. 1;
>
> b. "Defendants have violated the UDPA [so in original] by falsely and deceptively representing to consumers that they are associated with the Estate and Darger and because the Defendants have used deception, fraud, false pretense, misrepresentation or concealment, suppression or omission of material facts, either expressly or by implication," within paragraph 97 of the Complaint, Dkt. 1.
>
> c. "Defendant's acts are willful with the deliberate intent to cause confusion and deception in the marketplace" within paragraph 59 of the Complaint, Dkt. 1;
>
> d. "Ms. Lerner engaged in a large scale enterprise of copyright infringement centered on the works of Henry Darger that continues to this day," on page 2 of the response, Dkt. 23;
>
> e. "Defendants' conduct as alleged above is willful and is intended to, and is likely to, cause confusion, mistake, or deception," within paragraphs 85 and 91 of the Complaint, Dkt. 1;
>
> f. "willfully appropriated Darger's name and likeness," within paragraph 54 of the Complaint, Dkt. 1;
>
> g. "Additionally and throughout this period, Lerner willfully appropriated Darger's name and likeness in multiple ways, including without limitation, by using the trade name "HENRY DARGER" in connection with the domain name "officialhenrdarger.com" in order to falsely suggest a connection between Lerner's activities and Darger himself;" on page 3 of the response, Dkt. 23;
>
> h. "Beginning in 1973, Lerner took control of the Darger works under the false pretense that Darger had gifted her and Nathan Lerner both the physical copies of the Darger Works and the underlying copyright and intellectual property embodied in the Darger Works," within paragraph 44 of the Complaint, Dkt. 1;
>
> i. "Holding herself out as a representative of the "Henry Darger Estate" – or acting on behalf of the "Estate of Henry Darger", Compl. Dkt 1 Ex. 2, at 35, 38, and Lerner engaged in a large scale enterprise of copyright infringement centered on the works of Henry Darger that continue to this day" on page 2 of the response,

Dkt. 23.

### *2.     Copyright.*

The copyright law existing at the time of Mr. Darger's death did not include the current requirement of a written transfer of copyrights.  At that time, copyrights were transferred under common law, as here, *e.g.* 3 NIMMER ON COPYRIGHT, §10.03(B)(2) (footnotes omitted):

> Prior to the 1978 pre-emption, a common law copyright was capable of assignment so as to completely divest the author of his rights, without the necessity of observing any formalities.  After such an assignment, the author became a stranger to the copyright and might himself become an infringer, if he wrongfully used the assigned work. . . .

Illustrative of the requirements of Illinois common-law copyright transfer is the decision in *Morton v. Raphael*, 334 Ill. App. 399, 403-04 (1st Dist. 1948), in which the court ruled that evidence of a reservation of a copyright was necessary when an artist created something for another party that takes ownership of the work (emphasis added):

> Aside from the foregoing propositions we think there is an additional reason why plaintiff cannot recover under her amended complaint.  She admits that the Knickerbocker Hotel hired her to paint the murals.  In the absence of a copyright, exclusive common law right in the murals, upon which plaintiff relies, became vested in the new owner thereof, the Knickerbocker Hotel.  Under the generally accepted rule a painter or writer for hire who has failed to have his work copyrighted and has failed to reserve to himself such copyright, loses the exclusive common law right therein, and ownership and all rights therein vest in the new proprietor, the person who has commissioned the artist for the work.  In other words, plaintiff's position is no different than if she had been hired to paint the murals by defendants.  In that situation she would clearly have no claim against them.. . .

The uncontested evidence documents that Mr. Darger gave everything in his room to his landlord, Mr. Lerner, when he went to the nursing home to die.  This gift can only be interpreted as complete and to create the common-law transfer.  The Estate's argument requires the assumption that Mr. Darger knew about intellectual-property rights, chose not to transfer them, and said nothing about it despite uncontested evidence that he knew that he was leaving everything behind.  The argument may be described, fairly and politely, as "pure sophistry."

*Smith v. Moran,* 43 Ill. App. 2d 373, 377 (2d Dist. 1963).

Separately, this evidence creates the circumstantial evidence of Mr. Darger's intent and conforms to copyright law generally in addition to the Illinois law of common-law copyright, 3 *Nimmer on Copyright*, § 10.03(B)(2) (citations omitted):

> The question arises whether conveyance of a material object suffices to transfer the common law copyright in the work. . . . [I]t has been held that delivery of a manuscript suffices for that purpose – so long as the intent to pass title in the common law copyright is likewise present. . . . Nonetheless, the question in all instances would seem to be one of intent – to the extent that circumstances arise in which even long adverse possession fails to warrant the inference that the author intended to transfer his common law copyright, no transfer occurred.

This circumstantial evidence dovetails with the Estate admissions and the facts.

No question of fact exists about Mr. Darger's intent to give the copyright to Mr. Lerner because no evidence exists that he did anything other than give everything to Mr. Lerner. Any suggestion that Mr. Darger intended to reserve copyright constitutes, at most, only a "metaphysical doubt," *Matsushita Electric Industrial Co., Ltd.,* 475 U.S. at 586 (1986).

Separately, abandonment of objects carries with it giving loss of all rights in the objects, as set out above.

### 3.    *The Vivian Maier Case.*

The relatives parachuted in to this milieu with this case in 2022 after being contacted by an investigator associated with the copyright lawyer who prosecuted the Vivian Maier case. Facts ¶ 19.

Mr. Darger's case differs from Ms. Maier's case. Unlike Ms. Maier's case, Mr. Darger gave Mr. Lerner his art or threw away his art, thus abandoning it. Ms. Maier, instead, put her photographs and negatives in a storage locker and, apparently, forgot about them, and the contents of her locker were purchased by an unrelated party at an auction

https://www.chicagohistory.org/exhibition/vivian-maier-her-chicago/.  Her evidence established only mislaid/forgotten property; no evidence existed of a gift and. abandonment.

KIYOKO  LERNER, individually

By:  /s/ David W. Hepplewhite
Her Attorney

David W. Hepplewhite, David W. Hepplewhite, P.C.
70 West Madison Street, Suite 5650, Chicago, Illinois 60602-5046
312-782-7500, dwhpc@hepplewhitelaw.com

## CERTIFICATE OF SERVICE

I, David W. Hepplewhite, certify that this Revised Memorandum To Motion For Summary Judgment was filed with the court's CM/ECF system on August 4, 2025.

/s/ David W. Hepplewhite
Attorney For Plaintiffs