UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESTATE OF HENRY JOSEPH DARGER,<br><br>Plaintiff,<br><br>v.<br><br>KIYOKO LERNER, INDIVIDUALLY, AND AS EXECUTOR OF THE ESTATE OF NATHAN LERNER, AND AS TRUSTEE OF ANY TRUST ESTABLISHED BY NATHAN LERNER, AND THE NATHAN AND KIYOKO LERNER FOUNDATION,<br><br>Defendants. | No. 1:22-cv-03911<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

This matter arises from a property dispute regarding the works of Henry Joseph Darger ("Darger"), an artist who gained significant acclaim in the decades after his death in 1973. Darger's estate ("Plaintiff" or "the Estate") seeks recovery of his physical works and ownership of the associated copyrights from his former landlords, Nathan and Kiyoko Lerner, whom the Estate alleges wrongfully appropriated those interests.[1] Before the Court are the parties cross-motions for summary judgment. For the reasons set forth below, the Court denies both motions.

**Background**

Henry Joseph Darger was born in Chicago in 1892 and died intestate on April

[1] Following Nathan Lerner's death in 1997, Kiyoko succeeded to the interests in Darger's works and copyrights previously claimed by Nathan. R.153 ¶¶ 24–25.

13, 1973. R.153 ¶¶ 2–3. During his lifetime, Darger created extensive written and visual works which achieved international acclaim following his death. *Id.* ¶¶ 9, 34, 45. Darger is the original owner of the copyrights to his works. *Id.* ¶ 17.

For more than forty years, from at least 1932 until December 1972, Darger lived alone in a rented room at 851 West Webster Street (the "Webster property") in Chicago, Illinois. *Id.* ¶ 11. In the late 1950s, Nathan Lerner acquired the Webster property. *Id.* ¶ 12. Nathan Lerner married Kiyoko on July 1, 1967, and thereafter both of the Lerners held themselves out as Darger's landlords. *Id.* ¶ 13.

A 1977 writing from Nathan stated that Darger lived in his room at the Webster property until declining health made it difficult for him to climb the stairs. *Id.* ¶ 19. Although the precise date is unknown, Darger left the Webster property in December 1972, moving to St. Augustine Home for the Aged ("St. Augustine") in Chicago, Illinois. R.153 ¶ 11. Darger resided at St. Augustine, until his death on April 13, 1973. *Id.* ¶¶ 2, 10.

Nathan arranged for Darger's admission to St. Augustine and handled matters relating to Darger's Social Security. *Id.* ¶ 40. When he moved to St. Augustine, Darger left the contents of his room at the Webster property undisturbed. *Id.* ¶ 18; R. 155-3 at 12. Nathan remarked that when he visited Darger at St. Augustine, Darger would sit "alone, motionless," appeared "completely remote and apparently frightened," and barely glanced at Nathan such that Nathan did not know whether Darger recognized him. R.153 ¶ 19. Darger's death certificate identifies arteriosclerotic heart disease and senility as causes of death. R.152 at

414.

Kiyoko testified that she observed Nathan ask Darger if he wanted him to bring any of Darger's items from the Webster Property to St. Augustine. R. 155-3 at 12. Nathan explained that they "need[ed] to clean up for the next tenant to rent out." *Id*. Darger stated in response, "I don't need anything. It's all yours. I give everything in the room, it's yours. Throw them away for cleaning purposes." *Id*.

Thereafter, the Lerners began clearing the room which was "covered with everything [Darger] accumulated" over 40 years, including broken record players, old newspaper, broken furniture, and "debris of everything he picked up from garbage cans on the streets" *Id*. at 10, 12. Sometime during this process, Nathan discovered Darger's artistic works along with diaries, journals, banking records, drafts, sketches, correspondence, and other personal papers. R.153 ¶ 18. Nathan remarked about the discovery of Darger's works, that it was humbling to "have to admit that not until I looked under all the debris in his room did I become aware of the incredible world that Henry had created from within himself." *Id*. ¶ 19.

There is conflicting record evidence regarding whether Darger's works were discovered before or after he died. Kiyoko testified that Darger's works were found after he died. R. 155-3 at 38. By contrast, a 1999 letter written by Darger's former neighbor, David Berglund, states that he visited Darger in the hospital and told him "we were cleaning [your room] and came across paintings, that I couldn't bring myself to throw out." R.153 at 111. The letter states that upon hearing about the paintings, Darger, who was quiet and soft spoken before, "change[d] . . . his eyes

widened, he took a deep breath, paused for a moment and said, "Its [sic] too late now . . . they belong to Mr. Lerner."" *Id.* Then, according to the letter, Darger turned away and the interaction concluded. *Id.*[2] The parties are unaware of any other witness account concerning Darger's disposition of his personal or intellectual property. *Id.* ¶ 41.

After Darger's death, Nathan retained possession of the works and maintained Darger's former room, allowing visitors interested in Darger and his art to see it. *Id.* ¶ 44. Over 20 years later in 1995, Nathan filed a copyright application for Darger's seminal work "*In the Realms of the Unreal*" stating that he had obtained the copyright by "[t]ransfer of all rights by author." *Id.* ¶¶ 22–23.[3] Nathan assigned his claimed copyright interests to Kiyoko in April 1996 and died the following February, leaving all interests in Darger's works and ephemera to Kiyoko. *Id.* ¶¶ 24–27. Following Nathan's death, Kiyoko also secured additional copyrights of Darger's works. *Id.* ¶ 26. No writing has been discovered in which Darger conveyed property rights to Nathan, Kiyoko, or anyone else. *Id.* ¶ 38. Darger never mentioned his works to anyone, including the Lerners and David Berglund, all of whom were artists. R. 155-3.

---

[2] Defendant's counsel asserts that Mr. Berglund has since passed away but the record contains no substantiating evidence. R.185 at 8.

[3] The copyright registration states that this work was finalized in 1921, over 50 years before Darger's death. R. 153-1 at 15. The copyright registrations for other Darger's works list their date of completion as 1972, the year before Darger's death. *See id*. at 10, 17, 19.

Over the ensuing decades, Kiyoko sold, donated, exhibited, reproduced, and licensed Darger works. R. 153 ¶¶ 20–31. Among other actions, Ms. Lerner entered an agreement with the American Folk Art Museum under which she sold at least twenty-two of Darger's works for $1 million. *Id.* ¶ 30. In 2005, she entered an agreement with Artists Rights Society ("ARS") identifying herself as "executor of the estate of Henry Darger" and authorizing ARS to license reproductions of Darger's works. *Id.* ¶. 31. In 2013, she executed another licensing agreement on behalf of "The Estate of Henry Darger," and museums described certain donations from her as gifts from Darger's "heirs" or "estate." *Id.* ¶¶ 32, 34–35. In 2015, Kiyoko created and launched officialhenrydarger.com, a website which displayed Darger works, quoted his diary, identified exhibitions, and directed licensing inquiries to Artists Rights Society. *Id.* ¶ 37.

Neither Nathan Lerner nor Kiyoko Lerner was ever appointed or adjudicated to be Darger's legal representative or the representative of his estate. *Id.* ¶ 15. In September of 2020, counsel for "the descendants of Henry Darger" wrote to Kiyoko, demanding recovery of Darger's physical and intellectual property. R. 1-6. Included in the letter, which was marked as a protected settlement communication, was a footnote stating "Mr. Darger told David Berglund weeks before his death (a neighbor of Mr. Darger's, hired by Nathan Lerner to clean Mr. Darger's room after Mr. Darger was moved to a care facility) to throw away all of his paintings and manuscripts." *Id.*

In January of 2022 the first legal proceeding to act on behalf of the Estate of Henry Darger was filed. R.153 ¶ 16. The Circuit Court of Cook County, Illinois

appointed Christen Sadowski as Supervised Administrator on June 2, 2022, with authority to collect the Estate's personal-property and copyright interests. *Id.* ¶¶ 4–5. Sadowski, a distant relative of Darger, did not know Darger personally and had no knowledge of the circumstances surrounding his property or their relation until July 2019. R. 155-3 at 168. The parties stipulate that the Estate is Darger's legal successor in interest. R. 153 ¶¶ 1, 4–5. Kiyoko claims ownership of the copyrights, art, writings, ephemera, and trademarks associated with Darger, *id.* ¶ 6,[4] and the Estate's challenge to that claim forms the basis of this lawsuit.

Kiyoko moves for summary judgment, asserting four affirmative defenses—statute of limitations, laches, gift, and abandonment—each of which she contends are case dispositive. Additionally, Kiyoko seeks summary judgment as to Count VIII of the Complaint, arguing that the record establishes that she did not act in bad faith. The Estate seeks partial summary judgment as to liability on Counts I, II, IV, V, VI, and VIII of the Complaint.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there

[4] The summary judgment record contains no evidence of a trademark in the name "HENRY DARGER."

is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

The filing of cross-motions does not itself establish that no genuine disputes of material fact remain. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150*, 335 F.3d 643, 647 (7th Cir. 2003). The Court evaluates cross-motions for summary judgment separately and draws all reasonable inferences in favor of the party against whom the motion is directed. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

### I. Preliminary Evidentiary Rulings

Before turning to the merits, the Court resolves threshold evidentiary objections. There are 4 challenged pieces of evidence. Plaintiff argues that Kiyoko Lerner's deposition testimony regarding the discussion she observed between Nathan and Darger and David Berglund's 1999 letter detailing his visit to Darger in the

hospital are both inadmissible hearsay. Additionally, Plaintiff contends that the September 2020 demand letter sent on behalf of the descendants of Darger does not qualify as a judicial admission and is a protected settlement communication. Defendant challenges the use of the "senility" finding in Darger's death certificate as evidence bearing on his donative capacity.[5] The Court considers each in turn.

To be considered at summary judgment, evidence must be admissible at trial, though "the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton,* 604 F.3d 464, 466 (7th Cir.2010). If the evidence is inadmissible hearsay, the court may not consider it. *See Carlisle v. Deere & Co.,* 576 F.3d 649, 655 (7th Cir.2009). When a document submitted in support of a motion for summary judgment contains multiple layers of hearsay each layer must be admissible. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016).

***1. Defendant's Deposition Testimony***

Plaintiff argues that Defendant's testimony that she heard Darger tell her husband "[i]t's all yours. I give everything in the room, it's yours" is inadmissible hearsay. R. 150 at 9. Plaintiff fails to consider that when a party's claim or defense is "directly derived from a declarant," a statement that would have been admissible against the declarant as an opposing-party statement is likewise admissible against

---

[5] Defendant also objects to the admissibility of Plaintiff's heirship report because its author was not made available for deposition. R. 155 at 6–10. The Court need not resolve that objection because the parties stipulate that the Estate is Darger's legal successor in interest and that Sadowski is authorized to collect and pursue the Estate's property interests. R.153 ¶¶ 1, 4–5. Nor does the Court rely on the report in making its ruling.

the successor party. *See* Fed. R. Evid. 801(d)(2). If Darger himself asserted the ownership rights now asserted by the Estate, his own statements would be admissible against him as an opposing party statement under Fed. R. Evid. 801(d)(2), and a statement of then existing state of intent under Fed. R. Evid. 803(3). The statements are therefore admissible against Plaintiff. *See id*. advisory committee's note to 2024 amendment ("if an estate is bringing a claim for damages suffered by the decedent, any hearsay statement that would have been admitted against the decedent as a party-opponent under this rule is equally admissible against the estate."). Thus, the Court will consider Defendant's deposition testimony regarding Darger's statements.

***2. The Berglund Letter***

David Berglund's 1999 letter recounting a hospital visit with Darger presents a closer call. Plaintiff argues that Darger's statements in the letter are inadmissible because they lack an attestation required under 28 U.S.C. § 1746 and are otherwise hearsay not within any exception. R. 151 at 10. After careful review, the Court rejects these arguments.

Contrary to Plaintiff's assertion, 28 U.S.C. § 1746 does not impose a general rule that documentary evidence be sworn before it is admitted into evidence. Rather, it permits an unsworn declaration made under penalty of perjury to be sufficient in instances where the law ordinarily requires a sworn statement. *Id*. The Court considers Berglund's letter as evidence under Federal Rule of Evidence 807, which does not require swearing as a precondition for admission. Thus, while the lack of

such a declaration may bear on the document's trustworthiness under Rule 807, that absence does not independently bar admission.

In determining whether evidence is admissible under Rule 807, the Court considers "the totality of circumstances under which it was made and evidence, if any, corroborating the statement." Fed. R. Evid. 807. The Court should admit the evidence if it is both supported by sufficient guarantees of trustworthiness and is more probative on the point for which it is offered than other evidence the proponent can obtain through reasonable efforts. *Id*. at (a)(1)–(2). Whether those requirements are satisfied is a preliminary question of admissibility for the Court. Fed. R. 104(a). In resolving that question, the Court is not bound by the Rules of Evidence, except those concerning privilege. *Id*. The Court therefore examines the circumstances surrounding the letter.

Several considerations support admission. Berglund was a known neighbor and caretaker to Darger; both Berglund and his then-wife cooked meals for Darger, bathed him, were familiar with his living space, and at least occasionally dined with him. R. 167 ¶¶53–63; R. 155-3 at 38. Thus, Berglund visiting Darger in the hospital and having a role in clearing out Darger's room is consistent with other record evidence. Moreover, Berglund's letter recounts an encounter in which he personally participated and was prepared in 1999, more than two decades before this litigation, and there is no indication that Berglund himself claimed any ownership interest in Darger's property or otherwise profited from the Lerners' use of Darger's works. Furthermore, in a separate interview around the same time, Berglund gave a

materially consistent account of the interaction, detailing the discovery of Darger's works and Darger's response that it was "too late now." R. 180-1 at 25.

To be sure, there are countervailing considerations as well. The letter was written approximately twenty-six years after the events described, apparently at Defendant's request, and Berglund was never subject to cross-examination concerning it. [6] The record also contains discrepancies concerning when and how Darger's artwork was discovered. While those circumstances may diminish the weight a factfinder ascribes to the letter, the Court finds that, under the totality of the circumstances, they do not render it inadmissible under Rule 807. As such, the Court considers the letter.[7]

***3. The September 2020 demand letter***

Plaintiff objects to Defendant's use of the September 30, 2020, demand letter attached as Exhibit 6 to the Complaint. The letter, written on behalf of certain "descendants" of Darger, stated in a footnote that "Mr. Darger told David Berglund

---

[6] Defendant represents that Berglund is deceased and therefore unavailable to testify. R. 185 at 8. While Rule 807 does not formally require that the declarant be unavailable, Berglund's death is nonetheless relevant as to whether his letter is more probative than other evidence Defendant can reasonably obtain, because, if Berglund is deceased, no live testimony regarding purported interaction can be obtained. The present record, however, does not appear to contain competent evidence establishing Berglund's death. Accordingly, the Court's consideration of the letter is expressly conditioned on Defendant establishing Berglund's death. *See* Fed. R. Evid. 104(a).

[7] Darger's statements in the Berglund letter are admissible for under Rule 801(d)(2) for the same reasons identified in the discussion regarding Defendant's deposition testimony.

weeks before his death . . . to throw away all of his paintings and manuscripts." R. 1-6. Defendant contends that because Plaintiff attached the letter to its Complaint, the letter was incorporated into the pleading and the quoted statement therefore constitutes a binding judicial admission that Darger abandoned his works. The Court disagrees.

While Federal Rule of Civil Procedure 10(c) provides that a written instrument attached to a pleading becomes part of the pleading, it does not follow that the pleader adopts every factual assertion appearing in the attachment. Instead, courts consider "why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South* Bend, 163 F.3d 449, 455–56 (7th Cir. 1998). Plaintiff cited the September 2020 letter to establish that a demand for return of the property had been made. As such, the letter may be used by either party to establish whether a demand was made, but not to support Defendant's separate abandonment defense *See id.*[8]

The nature of the statement further counsels against treating it as a judicial admission. "[I]n order to qualify as judicial admissions, an attorney's statements

---

[8] Nor was the statement, when made, an admission by the Estate. The letter expressly stated that counsel represented "descendants of Henry Joseph Darger, Jr.," not Darger's Estate. The parties have since stipulated that no person filed a legal claim to act on behalf of Darger's Estate until January 2022, and Sadowski was not appointed administrator until June 2022. Thus, when counsel sent the letter in September 2020, he was not acting as counsel for a duly appointed representative of the Estate. That distinction, while not dispositive, undermines Defendant's contention that counsel's prelitigation statement constituted a formal concession binding the subsequently opened Estate.

must be deliberate, clear and unambiguous." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010). The sentence at issue was authored by counsel, before any discovery, and characterized counsel's preliminary investigation into events that occurred nearly fifty years prior. The record does not suggest that Counsel had personal knowledge of Darger's conversation with Berglund and offers no corroboration of the assertion that Darger told Berglund to "throw away" his possessions. Indeed, that characterization does not track Berglund's own 1999 accounts. Treating counsel's characterization as a conclusive admission of what Darger actually said would therefore be improper.

Additionally, Rule 408 provides an independent reason not to use the letter for Defendant's proposed purpose. The letter was expressly marked "SUBJECT TO FRE 408" and "CONFIDENTIAL—FOR SETTLEMENT PURPOSES ONLY." It also disputed Defendant's asserted ownership, threatened litigation, and stated that it was sent "in an attempt to resolve this matter amicably." These circumstances leave little doubt that the letter was sent to compromise on a disputed claim. Rule 408 bars using such statements "to prove or disprove the validity…of a disputed claim." Fed. R. Evid. 408(a)(2). That is precisely the use Defendant proposes—invoking the "throw away" language to establish that Darger abandoned the artwork, thereby defeating Plaintiff's claim of ownership. Such attempts at carving out factual admissions from settlement negotiations are exactly the ill Rule 408 protects against. *See Winchester Packaging, Inc. v. Mobil Chemical Co.*, 14 F.3d 316, 320 (7th Cir. 1994) ("The settlement of legal disputes out of court would be discouraged if settlement offers and

other documents in settlement negotiations were admissible in evidence.").[9] Therefore, Defendant may not use the demand letter as substantive proof that Darger abandoned his property.

#### *4. Darger's Death Certificate*

Defendant challenges Plaintiff's use of the "senility" diagnosis in Darger's death certificate to establish Darger's lack of donative capacity. R. 185 at 16–17. Defendant argues that the certificate is inadmissible because the treating physician is unavailable for examination and Plaintiff has not established a foundation under Rule 702 for treating that notation as an expert opinion concerning Darger's mental capacity. *Id*. Plaintiff responds that the certificate is a certified public record admissible under Rules 803(9) and 902(4). R. 178 at 4.

Plaintiff is correct as to admissibility. Rule 803(9) excludes from the rule against hearsay "record[s] of a birth, death, or marriage, if reported to a public office in accordance with a legal duty." Fed. R. Evid. 803(9). And a certified copy of an official public record is self-authenticating under Rule 902(4). The Estate therefore need not produce the physician who completed the certificate merely to admit the certified record or the information recorded on it.

[9] The fact that the letter was sent on behalf of descendants, whereas the present plaintiff is the Estate, does not alter that conclusion. Rule 408 focuses on whether the statement was made during negotiations concerning the disputed claim and whether it is now being offered to prove or disprove that claim. *See Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 541 (7th Cir. 2017). The ownership dispute asserted in the letter is materially the same dispute Defendant now seeks to resolve by using the letter against the Estate.

While the Court finds that the certificate is admissible, it is mindful of the concerns raised by Defendant. The certificate does not describe the nature or severity of Darger's senility, identify its cognitive manifestations, or offer an opinion concerning his ability to understand the nature and effect of a disposition of property at any particular time. Nor does the term "senility," standing alone, establish legal incapacity. Accordingly, while the Court will consider the death certificate—and the physician's notation of "senility"—as evidence relevant to Darger's mental condition in the time preceding his death, the certificate does not establish as a matter of law that Darger lacked the capacity to make a gift.

## II. Defendant's Motion for Summary Judgment

Defendant offers four arguments that it contends are case dispositive: that Plaintiff's claims are untimely and barred by statute of limitations and laches and, separately, that Darger either gifted his works to Nathan Lerner or abandoned them. Additionally, Defendant argues for summary judgment as to Count VIII of the Complaint which alleges a violation of Anticybersquatting Consumer Protection Act (ACPA) because Defendant contends that the record does not establish her bad faith. As discussed below, the Court does not find that summary judgment is warranted as to any of these defenses.

### A. Statute of Limitations and Laches

Defendant argues that Plaintiff's claims are barred by the applicable statutes of limitations and that the Estate's non-copyright claims are also barred by laches. R. 155 at 5–13. Defendant's statute of limitations argument fails because the discovery

rule bars application of the statute of limitations at summary judgment.

The discovery rule delays the start of the statute of limitations until "the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights." *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014) (quoting *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004). Plaintiff bears the burden of establishing delayed discovery and the limitations period begins when the claimant knows or reasonably should know both that an injury has occurred and that the injury was wrongfully caused. *See Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 85–86 (1995). The Estate has presented evidence that the known relatives with whom the administrator communicated had no prior knowledge of Darger or his artwork and that investigation of the Estate's potential rights began after the family connection came to light in 2019. *Id.*

The Court is unpersuaded by Defendant's argument that Darger's descendants knew or should have known about their claims because Darger's artwork was renowned, publicly exhibited, and discussed in newspapers. *Id.* at 10–12. The fact that Darger's artwork was publicized may establish that Darger's existence and artistic reputation were *knowable*. But it does not necessarily establish that a potential claimant *should have known* that property rights belonging to Darger or his Estate were being exercised by the Lerners or that the exercise was wrongful. Darger died intestate, with no close family members, and his art was publicly displayed for the first time in 1977, several years after his death. R. 153 ¶ 19. On this record, the

court cannot conclude as a matter of law that sufficient information existed to trigger a duty of further inquiry for putative claimants. *See Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981) ("In many, if not most, cases the time at which an injured party knows or reasonably should have known both of his injury and that it was wrongully [sic] caused will be a disputed question to be resolved by the finder of fact.").

Defendant further disputes the completeness and weight of that evidence and contends that the Estate must establish what every person in Darger's extended family knew or reasonably should have known. R. 155 7–10. The Court is similarly unpersuaded. While Defendant is correct that appointment of an estate representative does not restart an expired limitations period, the authorities on which Defendant relies do not establish or suggest that every person related to Darger is a predecessor whose actual or constructive knowledge must be disproven by the Estate.[10] The discovery rule therefore precludes summary judgment on Defendant's limitations defense.[11]

---

[10] Defendants cited authorities stand for the uncontroversial proposition that a descendant's knowledge of a claim can be used to bar an action brought by subsequent generations. *See*, *e.g. Bakalar v. Vavra*, 500 F. App'x 6, 8 (2d Cir. 2012) (upholding "imputed knowledge of potential intestate rights" to descendants); *Lloyd v. Treasurer of State of Ill.,* 401 Ill. 520, 528 (1948) (same). However, while proof of prior knowledge can sink a claim, it does not follow that proof of ignorance is required to sustain a claim. The Estate has furnished sufficient circumstantial evidence to invoke the discovery rule at summary judgment. That analysis may have differed if there was evidence that Darger had close familial relations at the time of his death. However, the record suggests the opposite.

[11] The Court also finds that the separate accrual and continuing violation rules bar Defendant's limitations arguments with respect to certain claims. The Court earlier addressed this issue, explaining that "[e]ach time an infringing work is reproduced or distributed, the infringer commits a new wrong," and further held that because the

The Court rejects Defendant's laches argument for substantially the same reason. Laches requires Defendant to establish both "lack of due diligence by the party asserting the claim" and "prejudice to the opposing party." *Tillman v. Pritzker*, 183 N.E.3d 94, 103 (Ill. 2021). Lack of diligence encompasses delay in bringing an action while having notice or knowledge of the defendant's conduct and an opportunity to sue. *Id.* ¶ 26. Thus, although the doctrines are distinct, the unresolved knowledge question that defeated summary judgment on Defendant's limitations defense also prevents the Court from finding as a matter of law that the Estate or a potential claimant lacked due diligence. *See Noland v. Mendoza*, 215 N.E.3d 130, 137 (Ill. 2022) (observing that Laches "is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party.").[12] As such, the Court declines to apply the doctrine of laches at summary judgment.

---

Complaint alleged recent conduct violating the Copyright Act, Lanham Act, and IUDTPA, "the Estate's claims arising from those current violations continue to accrue." *Estate of Darger v. Lerner*, 665 F. Supp. 3d 931, 938 (N.D. Ill. 2023) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014)); *see also Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999) (recognizing continuing violation in Lanham Act context); *Persis Int'l, Inc.*, 2012 WL at *4 (N.D. Ill. Sept. 18, 2012) (applying continuing violation principle IUDTPA claims). The record contains evidence that Defendant has continued to claim and commercially exploit rights in Darger's works and name during the relevant period. Thus, Defendant has not established that claims arising from later allegedly infringing or deceptive acts are barred.

[12] In her laches argument, defendant identifies Nathan Lerner's death as qualifying prejudice. R. 185 at 29. Because Defendant has not established the antecedent lack of diligence as a matter of law, the Court need not determine whether the asserted prejudice independently satisfies the second element.

**B. Gift**

Defendant argues that the summary judgment record conclusively establishes that Darger gifted his works to Nathan Lerner, while Plaintiff responds that the record conclusively establishes *lack of gift*. The Court disagrees with the parties and finds that the gift determination must be resolved by the factfinder.

"A "gift" is a voluntary, gratuitous transfer of property by one person to another where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee." *Moniuszko v. Moniuszko*, 238 Ill. App. 3d 523, 529 (1992). "[T]he elements of a valid gift are donative intent, the donor's parting with exclusive dominion and control over the subject of the gift, and delivery." *Dubisky v. United States*, 62 F.3d 182, 185 (7th Cir. 1995) (citing *Frey v. Wubbena,* 26 Ill.2d 62 (1962)). Whether a gift has been made "involves a mixed question of law and fact." *Moniuszko*, 238 Ill. App. 3d at 529 (citing 38 Am.Jur. *Gifts* § 108 (1968)). "The alleged donee carries the burden of proving the existence of donative intent in the donor, and proof must be clear and convincing in order to establish the gift." *Id*. (citing *Schramm v. Schramm*,13 Ill.2d 281, 288 (1958)).

Defendant contends that multiple pieces of evidence establish Darger's gift. First, Ms. Lerner's deposition testimony that Darger told Nathan, regarding the contents of his room, "I don't need anything. It's all yours. I give everything in the room. It's yours. Throw them away for cleaning purpose." Second, David Berglund's letter that a hospitalized Darger, after being notified about his paintings in his room, stated "Its [sic] too late now . . . They belong to Mr. Lerner." Third, Defendant

contends that the Estate's failure to produce contrary evidence is itself evidence that the Court should consider. R. 155 at 12–18.

The Court declines to consider Plaintiff's purported lack of evidence in determining whether Defendant has met her burden. Such consideration would improperly shift the burden of proof. *See Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").

Defendant's deposition testimony that Darger said, "I give everything in the room" is open to interpretation when read in context.[13] The statement arose in a conversation concerning clearing out Darger's room so that it could be rented to another tenant. A factfinder could reasonably understand Darger's statement to relate to the larger pieces of furniture and other items that would more immediately prevent the Lerners from making the room available, rather than a gift of his works.

[13] The Court rejects Defendant's position that because "credibility is not considered at summary judgment . . . Ms. Lerner's [deposition testimony] must be [considered] according to her words" R. 185 at 5–6. While it is true that courts should not make credibility determinations at summary judgment, testimony is viewed in the context of the record. *See e.g. Foster v. PNC Bank, Nat'l Ass'n,* 52 F.4th 315, 320 (7th Cir. 2022)("[C]ourts are allowed to find affidavits and other forms of evidence as insufficient or conclusory as a legal matter at the summary judgment stage; that is not an impermissible credibility determination."); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 934 (7th Cir. 1988) (observing that a "finder of fact would be free to disbelieve [a witness'] description of his intent, even if there were no contrary evidence."); *Kasper v. Saint Mary of Nazareth Hosp.*, 135 F.3d 1170, 1173 (7th Cir. 1998)("The hospital seems to assume that testimony that is not specifically contradicted must be believed; this is incorrect."). Thus, while the Court considers Ms. Lerner's testimony, it does not do so in isolation.

Ultimately, the record permits competing inferences concerning what Darger understood "everything" to mean and whether his statements sufficiently communicated donative intent with respect to his works.

Berglund's account as detailed in his 1999 letter is likewise open to interpretation. Darger's statement that the paintings "belong to Mr. Lerner" could reasonably be understood as confirmation of the completed gift of his works. However, it could also be understood as a realization that his works— some of which were over 50 years old at that point— were in the room in the first place. According to Berglund, Darger's eyes widened when he was first told that the paintings had been discovered. A factfinder could view that reaction as evidence that the paintings were not among the items Darger had specifically contemplated during the conversation with the Lerners, particularly given Nathan Lerner's recollection that the works were found after "looking under all the debris in his room." In that context, Darger's ensuing statement that it was "too late now" could be reasonably viewed as a rueful lament regarding the property he unwittingly had left behind. Those competing inferences cannot be resolved at summary judgment.

The Court likewise declines to resolve Darger's donative capacity as a matter of law. As discussed in Section I, the death certificate does not establish legal incapacity, and the remaining evidence permits competing inferences concerning Darger's ability to understand the nature and effect of the alleged disposition.

Therefore, that determination is left for the factfinder.[14]

**C. Abandonment**

Defendant argues that if the Court does not find a gift, it should find that Darger abandoned his works. "In general, property is considered to be abandoned when the owner, intending to relinquish all rights to the property, leaves it free to be appropriated by any other person." *Bell Leasing Brokerage, LLC v. Roger Auto Serv., Inc.*, 372 Ill. App. 3d 461, 467, (2007) (citing *Michael v. First Chicago Corp.,* 487 N.E.2d 403, 408–09 (1985)). "Whether a party has abandoned property is a question of fact, unless the party's conduct is so decisive and unambiguous that the question can be decided on summary judgment as a matter of law." *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 824 (7th Cir. 2018). "[T]he burden of proving an abandonment lies with the party who relies on it." *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 279 (1999)

In support of its abandonment theory, Defendant first argues that Plaintiff's statement that Darger "left behind an extensive oeuvre of drawings, paintings,

---

[14] Plaintiff also argues that the Lerners stood in a fiduciary relationship with Darger, which, if established could give rise to a presumption against the validity of a transaction benefitting the Lerners and alter the burdens governing Defendant's gift theory. *See* R. 151 at 7. The Court need not resolve that issue because it denies Defendant's motion on other grounds, and Plaintiff does not seek resolution of the issue at summary judgment. *See* R. 178 at 13. ("The issue [of fiduciary duty] need not be resolved at summary judgment stage, and the Estate reserves its allegations concerning fiduciary duties for trial").

collages and literary works" constitutes a judicial admission of abandonment.[15] R. 155 at 19. Likewise, Defendant points to an admission that Darger "made no arrangements before his death" as a judicial admission of abandonment. *Id*. The Court has little trouble setting these arguments aside for largely the same reason: they ascribe one meaning for language that is ambiguous.

That Darger "left behind" a large body of works could be a reference to literally leaving items in a room but could also be a description of the metaphorical act of "leaving behind" a legacy through works whose impact outlives their creator. Similarly, a failure to "make arrangements" before one's death could be read as someone indifferent to the disposition of their possessions, or it could simply mean they died suddenly or without estate planning documents. In both instances, the cited language is open to interpretation and thus does not provide basis for summary judgment.

Those pleaded arguments do not, however, exhaust Defendant's abandonment theory. The record contains substantial circumstantial evidence from which a factfinder could infer abandonment. Darger permanently left the room in which he lived for decades and took none of its contents with him. The record contains no evidence that he thereafter paid rent, retained access to the room, asked that any property be stored for him, arranged to retrieve it, or expected to return. And,

[15] Similarly, Defendant argues that the September 2020 demand letter's statement that Darger said to "throw away" his things also constitutes abandonment but as discussed in Section I, the Court declines to consider that argument.

according to Defendant, when asked about his property, Darger remarked, "I don't need anything" and told the Lerners to "[t]hrow them away for cleaning up purpose." That evidence is sufficient to permit a finding of abandonment. But it does not compel such a finding as a matter of law.

Abandonment requires an intent to relinquish ownership, not merely the physical act of leaving property behind. *Bell Leasing*, 372 Ill. App. 3d at 467. A reasonable factfinder could conclude that Darger left the Webster property because his declining health required placement in a care facility and that his conversation with Nathan occurred in the narrower context of clearing the room for a new tenant. On that view, Darger's statements could reflect a relinquishment of responsibility for disposing of the room's contents without necessarily demonstrating a conscious intent to surrender ownership of his previously private creative works, some of which had been created decades earlier and were never shared despite Darger's contact with other artists. That inference finds some support in Berglund's account that, when later told about the paintings, Darger's eyes widened before he responded that it was "too late now." R. 180-1 at 25.

Ultimately, because the record lends itself to multiple reasonable interpretations, summary judgment is inappropriate. *See Narkiewicz-Laine v. Doyle*, No. 11 C 1826, 2012 WL 6018986, at *2 (N.D. Ill. Dec. 3, 2012) ("The question of abandonment is one for the trier of fact."). The Court finds that reserving resolution of this matter for the factfinder particularly appropriate given the heightened evidentiary standard for abandonment. *See Zych*, 186 Ill. 2d at 279 ("It is incumbent

upon that party [seeking abandonment] to prove, by strong, convincing and unequivocal evidence, that the owner freely intended to relinquish ownership.").

**D. Count VIII: ACPA Bad Faith Intent**

Defendant separately argues that she is entitled to summary judgment on Count VIII which is brought under the ACPA. Defendant asserts that Plaintiff cannot prove the required element of "bad faith intent to profit" because the Estate lacks evidence regarding Defendant's subjective state of mind when she registered officialhenrydarger.com. R. 155 at 31. In determining bad faith, the ACPA identifies a nonexclusive set of objective factors bearing on intent. *See* 15 U.S.C. §1125(d)(1)(B)(i). Thus, Plaintiff's inability to testify directly to Defendant's subjective state of mind does not in itself establish the absence of bad faith.

Instead, the record permits competing inferences. Defendant registered officialhenrydarger.com in 2015, uses Darger's name rather than her own in the domain, displays Darger's works on the site, and directs requests to use those works to Artists Rights Society, through which Defendant receives licensing revenue. A reasonable factfinder could consider those circumstances in determining whether Defendant intended to profit from the asserted Darger mark in bad faith. Defendant, meanwhile, points to evidence that she believed she lawfully owned the relevant rights and that she and Nathan sought to preserve Darger's artistic legacy, including by declining uses that might have generated additional income. Those circumstances may support good faith, but they do not compel that conclusion as a matter of law.

Accordingly, Defendant is not entitled to summary judgment on Count VIII for lack of bad-faith intent.

## III. Plaintiff's Motion for Summary Judgment

### A. Counts I-II: Copyright Ownership and Infringement

Plaintiff seeks summary judgment declaring that it owns the copyrights in Darger's works and, as a result, that Defendant is liable for copyright infringement. The parties agree that Darger was the original owner of the copyrights. The dispute here, as elsewhere, is whether those rights passed to Nathan Lerner before Darger's death.

As discussed above, the record does not permit the Court to determine whether Darger gifted or abandoned the tangible works left in his room. Furthermore, ownership of the physical works themselves does not resolve ownership of the associated common-law copyrights. As this Court previously explained, under the law governing Darger's works, ownership of the material object does not necessarily carry the common-law copyright absent an intent to transfer the copyright as well. *Estate of Darger*, 665 F. Supp. at 940; *see also Bell v. Combined Registry Company,* 397 F.Supp. 1241, 1249 (N.D.Ill.1975), *aff'd, 536* F.2d 164 (7th Cir. 1976) ("Abandonment of a copyright occurs if the owner intends to give up his copyright protection."). Thus, the same factual disputes concerning what Darger intended when he told Nathan that "everything" in the room was his—and what Darger later meant when he stated that the paintings "belong to Mr. Lerner"—also bear on whether Darger intended to transfer his common-law copyrights.

Because the record permits competing reasonable inferences as to that intent, Plaintiff has not established copyright ownership as a matter of law. Its motion for summary judgment on Count I is therefore denied, and because its infringement claim depends on establishing ownership of the copyrights, summary judgment on Count II is denied as well.

**B. Counts IV-VI and Count VIII: Lanham Act, Unfair Competition, IUDTPA, and ACPA Claims**

Plaintiff also moves for summary judgment on Counts IV, V, and VI, which assert claims for false designation of origin under the Lanham Act, common-law unfair competition, and violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), respectively. Plaintiff analyzes all three claims under the Lanham Act framework. *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 639 (N.D. Ill. 2009) *(citing Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983)) (analyzing IUDTPA and common law actions under the Lanham Act framework where "plaintiff's factual allegations [under IUDTPA and common law actions] form the basis for plaintiff's claims under the Lanham Act").

To establish a false-designation claim under the Lanham Act, a plaintiff must show that (1) it owns a protectable mark and (2) the defendant's use of that mark is likely to cause confusion among consumers. *See Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008). Plaintiff however applies a different four-part test, citing *Desmond v. Chicago Boxed Beef Distributors*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013). The cited portion of *Desmond*, however, concerns analysis of trademark dilution claims, not false designation of origin. *Id.*

Evaluated under the applicable governing standard, Plaintiff's Motion fails at threshold because Plaintiff has not established that the name HENRY DARGER constitutes a protectable mark. The only support Plaintiff identifies establishing a protectable mark comes from Defendant's Reply Brief in support of her Motion to Dismiss. *See* R. 150-1 at ¶ 30 ("[Defendant] confirmed her claim to the trademark "Henry Darger" in her Reply Memorandum in connection with her Motion to Dismiss"). Even taken at face, the cited discussion in Defendant's Reply brief does not establish that "HENRY DARGER" is trademarked and, more importantly, is not competent evidence. *See Lee v. Chi. Youth Ctrs.*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014) ("[I]t is basic that unsupported statements of lawyers in briefs are not evidence, do not count, and are given no weight."). Thus, the Court cannot conclude as a matter of law that a registered mark exists and where a disputed mark is unregistered, Plaintiff "bears the burden of establishing that the mark is entitled to protection." *Baig v. Coca-Cola Co.*, 607 Fed. Appx. 557, 559-560 (7th Cir. 2015). Because Plaintiff has not offered supporting evidence, the Court declines to find as a matter of law that the name HENRY DARGER constitutes a protectable mark.

Even if the HENRY DARGER name were protectable, Plaintiff has not established that it owns enforceable rights in the asserted mark. "The determination of whether a party has established protectable rights in a trademark is made on a case by case basis, considering the totality of the circumstances." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999). Here, Plaintiff points to Darger's "substantial notoriety" but provides no evidence

connecting Darger's fame to Plaintiff's entitlement to the HENRY DARGER mark. Likewise, Plaintiff also offers only conclusory mention regarding the likelihood of confusion, which requires analysis of several factors. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 677 (7th Cir. 2001). Accordingly, Plaintiff's motion for summary judgment on Counts IV, V, and VI is denied.[16]

The same problem defeats Plaintiff's motion for summary judgment on Count VIII, which alleges cybersquatting under the ACPA. The ACPA authorizes a civil action by the "owner of a mark." 15 U.S.C. § 1125(d)(1)(A). Thus, Plaintiff's ACPA claim necessarily requires proof of a protectable mark and ownership rights to that mark. *See Mon Aimee Chocolat, Inc. v. Tushiya LLC*, 2015 U.S. Dist. LEXIS 143549, at *17 (N.D. Ill. 2015) (Noting that ACPA liability requires that plaintiff is "the owner of a protected mark"). Plaintiff has not established as a matter of law that the HENRY DARGER mark exists, that Plaintiff owns the mark, or that its claimed rights to the mark existed when Defendant registered officialhenrydarger.com. Therefore, Plaintiff's motion for summary judgment on Count VIII is denied.

## CONCLUSION

[16] Count VI invokes § 2(a)(5) of the IUDTPA, which prohibits representing that a person has a "sponsorship, approval, status, affiliation, or connection" that the person does not have. Plaintiff, however, does not develop an independent theory of liability under that provision based on Defendant's representations concerning her status or affiliation with the Estate. Instead, Plaintiff expressly analyzes Count VI together with Counts IV and V under the Lanham Act framework. The Court therefore addresses the motion on the theory Plaintiff presents and does not decide whether § 2(a)(5) could independently support liability based on those representations.

For the foregoing reasons, the Court denies the Estate's partial motion for summary judgment and denies Defendant's motion for summary judgment.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: September 28, 2026